Arthur Jannusch, by Emil Jannusch, Appellee, v.
Weber Brothers Metal Works, Appellant.

Gen. No. 32,348.

1

Opinion filed May 14, 1928.

OTTO A. JABUREK and JAMES S. WIGHT, for appellant.

AUGUSTIN J. BOWE and WILLIAM J. BOWE, for appellee.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

Plaintiff sued and filed a declaration which averred that plaintiff was employed by defendant for a year and a half prior to and including January, 1925, and that while so employed in defendant's metal spinning establishment, as a direct result of the wilful violation and failure of defendant to comply with the Occupational Diseases Act (Cahill's St. ch. 48, ¶ 185 *et seq.;* Smith-Hurd's Ill. Rev. St. 1927, ch. 48, p. 1309), plaintiff became infected with an occupational disease peculiar to the work and process of polishing and buffing in which he was engaged, to wit, pulmonary tuberculosis.

The defendant filed a plea of the general issue. There was a trial by jury and a verdict finding the defendant guilty and assessing plaintiff's damages at $5,000, upon which the court entered judgment.

Defendant first contends the proof did not show that plaintiff contracted an industrial disease at defendant's plant.

The evidence for plaintiff tended to show that plaintiff, at that time a boy 16 years of age, began to work for the defendant in April, 1923; that his hours of employment were from 7:45 to 5:00, with a half hour for lunch, and he received wages of $28.80 a week; that plaintiff was born on a farm at West Northfield, Illinois, and lived there until he was through school, having graduated when he was between 12 and 13 years of age. His father died in 1921, and so far as plaintiff knows his death was caused by asthma. Plaintiff has four brothers living, one brother dead, two sisters living, and two dead. He left the farm when he was between 13 and 14 years of age, and his health up to that time was good. He then went to work in a greenhouse and did general work, planting, watering and looking after the flowers. He worked there about a year and then went to his brother-in-law's on a farm and stayed there until he was 16 years of age. During most of that time he was out of doors doing farm work. His health was good and he was not ill during that time. He has four brothers living, and so far as he knows they are all healthy and able-bodied. His sisters are also in good health. One of them lives on a farm and the other in Des Plaines. One brother died when plaintiff was about a year old. He does not know what was the cause of his death. In 1918 one sister died, he thought of the flu, during the flu epidemic. She had been sick about two weeks. The other sister died in 1924 of tuberculosis while she was living in Des Plaines. She was married and did not live with plaintiff and had not lived with him for about two years.

His mother died of cancer of the stomach. Just before plaintiff went to work for defendant, he worked about a month for the Benjamin Electric Company. He was examined for insurance and was passed. The doctor examined his lungs with a stethoscope and gave him a physical examination. This was about six months before he went to work for defendant.

Plaintiff began work with defendant as a blank cutter, that is, he cut discs that were used for spinning. These were metal discs of different kinds of metal and were cut in shape for the metal finishers, just flat discs of different sizes and also round. Machines were used in doing this work—two small wheels close together, turning around. There was no dust created by that process.

After that time plaintiff started spinning, working on a lathe in the same room and working the same hours. His work consisted of using an object to get the thing into a certain shape. He used emery cloth because sometimes the object would be scratched or be uneven and the cloth was used to take the scratches out of it. Each job had a number and he marked the number of hours that he worked on the job. He worked as a spinner for a year or a little more and during that time he sometimes used the emery cloth six or seven hours, or more if it was a big job. The average time the emery cloth was used during a week would be about 16 or 18 hours for one person. The size of the emery cloth used would depend on the size of the job. The emery would gradually wear off. It would take about a minute for the emery to wear off on one spot in doing this work. He used the emery cloth by holding it in his hands against the object. That would take the scratches out of the metal and brighten it up. He says:

"There was dust created by that process, enough to get our clothes full. You could see it in the air and you could see it on your clothes. It would not exactly

get into your clothes, but it would be spread out in the air by flying around in the air. My face was about eighteen inches away from the object. Some of the dust would fly upward and some downward. We wore shop coats and I noticed some on the caps and I noticed dust around on the floor. The floor right by the lathe was swept up after we got through with each job. There was a janitor there that did the sweeping. He would sweep up after each job unless there was a big pile of trimmings or something near the lathe. When he swept up, the trimmings that we had cut off of the spinnings would be on the floor."

The first time plaintiff had trouble with his lungs was along in November or December of 1924, when he started to cough, which he had never done before except when he had a cold. He kept on working until the latter part of January, 1925, when he went to Dr. Myers at Des Plaines, Illinois, and after that to Dr. Earl. He quit work in January, stayed home for about two weeks and then went to the County Hospital for several weeks. From there he went to the Municipal Sanitarium, where he was at the time of the trial.

He said that he had no hemorrhages of blood from his lungs and that the symptoms he had were just the cough and the raising of sputum. While he worked for defendant he used the machine at various things, and when he was not using the emery cloth there were other machines, 12 or 14, close by and some one else would be using the emery cloth, so that the emery polishing and buffing would be going on most of the time on one or more of the machines.

Medical testimony was introduced to the effect that tuberculosis was one of the most widespread diseases known and is found in almost all parts of the civilized world; that it is an infectious disease and that it is usually transmitted by direct contact, drinking milk or by taking in other food which happens to have the germ in it, such as butter, cheese and tubercular meat,

or in inhaling air which has the tubercular germ. About 10 per cent of all deaths in cities are brought about by tuberculosis. In practically everyone some tuberculosis development is found. Tuberculosis is not hereditary, strictly speaking. Tuberculosis is a disease produced when the body is invaded by a germ known as the tubercle bacillus. In dwellers in cities micro-organism is practically present in 90 per cent, at least, of adults, but it is not active. It is active in only a relatively small proportion of the population. The chief sources of the disease are exposure, contact and drinking of tubercular milk. Any occupation where dust is produced is hazardous because it lights up and brings about tubercular disease by irritating the lungs or irritating the glands in the neck, but some kinds of dust are more dangerous than others. Some varieties of dust or particles have sharp edges and they damage the lung tissue to a greater degree than others, while some varieties of dust are of a poisonous nature. For instance, dust derived from zinc, brass and lead are more hazardous than just simply dust. This dust sets up an inflammation in the respiratory tract and, if the tubercular germ is present, it may lodge in the inflamed area and consumption will result. The mere presence of or inclination to tuberculosis does not always result in the disease itself. There is a difference between ordinary dust on the street and metallic dust. Metallic dust is abrasive and sometimes it is poisonous. By abrasive the witness meant cutting and that it had sharp edges. We breathe on an average about 20 times a minute and it is necessary for air to enter the lungs in order for us to live. If the air is impure by reason of dust, and there is so much impurity that the nose cannot screen it out and the lining from the bronchial tubes cannot screen it, then the lungs become invaded and they are damaged by the presence of the dust.

Plaintiff was examined by physicians who testified that X-ray pictures showed that plaintiff's lungs were infected with tuberculosis, and this condition was also shown by an examination of plaintiff. In response to hypothetical questions, the physicians answered that, in their opinion, there might or could with reasonable medical certainty be a causal relation between the work which the hypothetical man was doing and the dust which was present and the subsequent development of tubercular disease in plaintiff's lungs.

It is, of course, impossible in a case of this kind to prove the cause of a disease with anything like mathematical accuracy or with the certainty with which the results of other causes may be shown. Medicine is not an exact science. Its method is that of induction rather than deduction, and we think, contrary to the first contention of the defendant here, that the evidence we have recited, with a great deal of other evidence which is in the record, made a question for the jury as to whether the plaintiff contracted this disease in the course of his employment at the plant of the defendant. As to what is an occupational disease within the meaning of the statute, the answer is found in section 1 of the statute (Cahill's St. ch. 48, ¶ 185; Smith-Hurd's Ill. Rev. St. 1927, p. 1309), which in substance provides that every employer engaged in carrying out any work or process which might produce any illness or disease peculiar to the work or process carried on, or which subjects the employees to the danger of the illness or disease incident to such work or process to which employees are not ordinarily exposed in other lines of employment, shall provide certain means for the protection of such employees from these diseases.

The evidence shows that tuberculosis is not an illness which is exclusively caused by conditions such as those under which plaintiff worked, but we think the evidence does establish that the disease of tuberculosis is an illness to which employees in the kind of work

plaintiff was going are peculiarly liable. We also think that the evidence indicates that it is a disease to which employees would not be ordinarily exposed in other lines of employment, and we therefore conclude that the disease is within the definition of those to which the statute in question applies, and that plaintiff became infected therewith in the course of his employment with defendant.

The defendant next contends that the evidence fails to show that there was any violation of the Occupational Diseases Act, Cahill's St. ch. 48, ¶ 185 *et seq.*, by the defendant. We shall not undertake to review the evidence at length on this point. In the last analysis the question was one of fact for the jury to pass upon, and there was evidence of experts and others tending to show that there were well-known methods by which the dangers from metallic dust might have been avoided. This might have been done by means of water playing upon the work, through the system of suction blowers, or by a proper system of ventilation. None of these methods was employed or used by defendant, and we think the jury could find, if it saw fit, that there had been a wilful violation of the statute. It is next urged that the court erred in the giving and refusing of instructions. The third instruction is complained of, by which the jury was told:

"The Court instructs the jury in the years of 1924 and 1925 there was in full force and effect in the State of Illinois a statute as follows:

"All poisonous or noxious fumes or gases arising from any process, and all dust of a character injurious to the health of the persons employed, which is created in the course of a manufacturing process, within such factory, mill or workshop, shall be removed, as far as practicable, by either ventilating or exhaust devices."

It is urged that, as the statute quoted is section 12 of the Health and Safety Act, Cahill's St. ch. 48, ¶ 154, and as neither of the counts in plaintiff's declaration

charged a violation of that particular act, both being based entirely on the Occupational Diseases Act, Cahill's St. ch. 48, ¶ 185 *et seq.*, the instruction was erroneous. It is said that if plaintiff desired to claim a violation of the Health and Safety Act (Cahill's St. ch. 48; Smith-Hurd's Ill. Rev. St. ch. 48), he should have done so in a separate count, as was done in *Arnell v. Superior Mirror Co.*, 210 Ill. App. 486. It is also urged that the instruction was erroneous within the rule announced in *Wing v. Smith*, 190 Ill. 275, where it was held that the giving of an instruction which recited sections of an act not applicable was prejudicial error. In that case, however, the sections recited in the instruction did not conform to the allegations of the declaration. The section here quoted does conform in our opinion. The declaration was broad enough to cover both acts. We therefore hold that the giving of this instruction was not error.

Defendant further contends that the court erred in refusing to give the following instruction:

"A reasonable device, means or method means a device, means or method which it is reasonably practicable for an employer to use in connection with the work or process in question. An approved device, means or method, as used in these instructions, means a device, means or method adopted and used by manufacturers engaged in similar processes."

It is said that logically an approved device must mean one approved by the persons for whose use it was made, that is, the manufacturers. Plainly this would mean that the manufacturers would have it in their power to practically nullify the law. We do not think that such could have been the intention of the legislature.

It is urged that the evidence of the experts invaded the province of the jury and their opinions were not based upon sufficient evidence. It is also urged that the fact that the attorney for plaintiff directed the

attention of the jury to the fact that certain witnesses who had appeared in behalf of defendant were members of the Brass Manufacturers Association was prejudicial, and for that reason the motion for a new trial should have been granted, and finally it is contended that the case involves an attempt to recover damages by imputing to a reasonably healthful occupation the hazards of a work of an entirely different character. We do not think there is any merit to any of these contentions. The act must be given a reasonable construction, which will tend to effect the purpose which was in the mind of the legislature when it was passed.

No good reason appearing for reversal the judgment will be affirmed.

*Affirmed.*

McSurely and O'Connor, JJ., concur.