HENRY WOLF v. MALLINCKRODT CHEMICAL WORKS, Appellant.—81 S. W. (2d) 323.

Division Two, March 30, 1935.

*Thomas Bond* for appellant.

*S. F. Pinter* and *Mason, Goodman & Flynn* for respondent.

FITZSIMMONS, C.—This case comes to the writer upon reassignment. Defendant appeals from an adverse judgment of the circuit court, city of St. Louis, in the sum of $12,500. The verdict of the jury was for $25,000 but was reduced by *remittitur*. Plaintiff sued for injuries to his health caused by contracting an occupational disease while he was employed in defendant's chemical works in St. Louis. Defendant's principal complaint is that the trial court erred in refusing to sustain its demurrer to the evidence.

Plaintiff, by his second amended petition, charged that for about six years prior to August 31, 1923, he was employed by defendant, Mallinckrodt Chemical Works, at its chemical manufacturing plant in St. Louis; that "for about one and a half years or more" prior to August 31, 1923, he, in the course of his employment, handled and was about chemicals and minerals which emitted poisonous gases, vapors, fumes and dust in harmful quantities and under harmful conditions. These chemicals and minerals with which plaintiff worked, according to the petition, were zinc stearate, pyrogallic acid, and fourteen other simples and compounds. Plaintiff further alleged

that, while he was so employed, he inhaled and absorbed poisonous gases, vapors, fumes and dust, and as a result he contracted "a severe form of chronic occupational disease."

The negligence attributed to defendant was based on the common law and the Missouri statutes. The common-law negligence charged was that defendant did not furnish plaintiff a reasonably safe place in which to work by failing to provide respirators while plaintiff was about chemicals and minerals which emitted poisonous gases, vapors, fumes and dust. Failure to warn plaintiff that his health would be endangered by the inhalation and absorption of gases, etc., was also alleged.

Statutory negligence pleaded was: (1) Failure of defendant to adopt and provide approved and effective devices, means or methods for the prevention of industrial or occupational diseases "incident to plaintiff's said work;" (2) its failure to provide adequate and approved respirators, and "to provide working clothes to be used exclusively by plaintiff in his work;" (3) its failure to provide hoods with suction fans for machines which subjected plaintiff to the inhalation of dust and poisonous gases; (4) its failure to cause plaintiff to be examined once a month by a physician for the determination of the existence or development of any occupational disease; (5) its failure to post "an appropriate notice of the known dangers to the health of its employees and particularly the plaintiff arising from the work together with simple instructions as to any known means of avoiding so far as possible the injurious consequences thereof." Defendant by its answer admitted that it was engaged in the manufacture of chemicals and other products in St. Louis and denied all other allegations.

In our opinion the test of the demurrer is whether there was evidence tending to prove that combined sclerosis—a degenerative process of the spinal cord—from which experts testified plaintiff was suffering—was an occupational disease under the applicable law. Although plaintiff charged in his petition that he was engaged in handling and being about harmful chemicals for about one and a half years or more prior to his termination of his employment on August 31, 1923, he testified, without objection as to the time covered, concerning his work during his six-year period of service. Defendant has a large plant, made up of sundry separate buildings, each of which is used for the manufacture of different chemical compounds, several kinds being made in each building. There is also a mill room or building in which chemical preparations, made up in the other buildings, are finished and packed for commerce. Plaintiff, during his employment of six years, worked in these several buildings, including the mill room. He was a laborer and, it would seem, was shifted from place to place, according to the needs of the industry.

The chemical elements of the several compounds were mixed, boiled, heated, dried, separated, distilled and otherwise treated on a plane of quantity production. The labor routine of each process was simple and supervised.

Plaintiff worked several times in building 20 where zinc stearate, a baby powder, and aluminum stearate were made. Zinc stearate was produced in a vat twelve feet high, six feet wide and equipped with a stirrer. Soda ash was first brought to a boil in the vat. Lamb fat containing stearate was added to the solution. Then zinc sulphate in measured quantities was put in. The boiling mixture was watched and tested from time to time until at last the compound was run off from the vat to a centrifugal machine which cast out a precipitated dry powder, the zinc stearate. This powder was then sifted into a barrel and was sent to the mill room for finishing. In the process of manufacture the zinc sulphate was eliminated by the fusion of the zinc element with the stearate. Plaintiff testified that, during two periods of service in building 20, he did the work of boiling, adding elements, testing the materials in the vat, operating the centrifugal machine and sifting the resultant zinc stearate. He also testified that when the powder was produced and sifted there was much dust—"you couldn't see nothing any more so much dust was in there." He made aluminum stearate by the same process except that an aluminum salt took the place of the zinc salt. The aluminum stearate did not make as much dust as the zinc stearate. The plaintiff also testified that, in the manufacture of zinc and aluminum stearate, dust came out of the vat in clouds when the boiling process was half done. He also worked on stearates in the mill or finishing room and complained of the dust which he inhaled there. Whether zinc stearate was poisonous was an issue raised by the conflicting testimony of chemists. We will not here prolong this statement with further details of plaintiff's labors in compounding many other chemicals. This for the reason that the only medical expert who testified as to the cause of plaintiff's condition said it could be due to absorption of zinc. And the only zinc with which plaintiff came in contact was zinc sulphate used in the manufacture of zinc stearate.

Testimony given by plaintiff tending to prove violation of the occupational disease statutes was: While he was making stearates he asked the foreman for a respirator and was told he did not need one. There was not a ventilator draft in the finishing room. No one informed him that zinc stearate was poisonous. On cross-examination plaintiff admitted the presence of some suction fans and ventilators but denied that they were in place or in use at the vats and machines where he worked. He also testified that for a time he used a respirator, made of a sponge and given to him by a fellow workman.

Plaintiff testified that he was in good health and weighed 175

pounds when he went to work for defendant. His weight was 134 pounds when he left defendant's service August 31, 1923. During the last six months of his employment (which was at zinc stearate), he coughed a great deal, emitting white stuff "like talcum powder." His throat and lungs were sore. His arms hurt and his hands were without feeling. He could not eat much. His stomach became swollen. He walked with difficulty and, after he left defendant's employment, he could not move for a time. He was in hospital twice for treatment and was much improved at time of trial. The medical testimony was that, while he was in hospital, he was treated for locomotor ataxia, a post effect of syphilis.

Dr. II. W. Hoge, a physician specializing in mental and nervous diseases, called by plaintiff, testified that he made four examinations of plaintiff, in order to determine the presence or absence of any disease of the nervous system. He explained the various tests he made, stated the abnormal reactions of plaintiff, and, in answer to a hypothetical question, founded on plaintiff's testimony, he gave it as his opinion that Wolf was suffering from a nervous disorder consisting of a degeneration of the posterior columns of the spinal cord and known as combined sclerosis. In reply to a further question he stated that the combined sclerosis from which he found plaintiff to be suffering could be due to absorption of zinc. As we have said, the record shows that the only zinc compound with which plaintiff came in contact was zinc sulphate, used in the manufacture of zinc stearate, a baby powder.

On cross-examination Dr. Hoge testified: "I never have had a case of a man who had contracted combined sclerosis from zinc poisoning. I do not know then what amount of exposure would be necessary or what amount of absorption would be necessary."

The doctor also testified that certain abnormalities which he found in plaintiff and upon which he rested his answer that plaintiff had combined sclerosis were cardinal symptoms of locomotor ataxia, scientifically called *tabes dorsalis*. His testimony on this point was: "I found an absence of the knee jerks and that he was ataxic in walking and these are two of the cardinal symptoms of locomotor ataxia. A third cardinal symptom would be the failure of the pupils to react to light, and I found his pupils reacted very slightly to light."

Dr. Hoge said he would believe, from seeing him walk, that plaintiff had locomotor ataxia, "but I wouldn't necessarily believe that he didn't have anything else."

Dr. Francis M. Barnes, Jr., a specialist in mental and nervous diseases, who also testified for plaintiff, and who examined the physical side of plaintiff with reference to the nervous system, and made the same tests as Dr. Hoge, said in answer to the same hypothetical question which had been submitted to Dr. Hoge, that, in his opinion,

plaintiff was suffering from a combined sclerosis, a degenerative process of the spinal cord. Touching the cause, he testified: "From the question as to the mode of his work, which was taken into consideration, I have assumed that that was the cause of producing this diseased condition of the spinal cord. It has nothing to do with the diagnosis other than from a causal standpoint." On cross-examination Dr. Barnes further testified concerning the cause: "There are a great many causes of combined sclerosis; infection, intoxication, injuries from groupings of that character and in some of the cases there is apparently no cause whatsoever—it just comes. Syphilis can cause sclerosis of the cord but not that which is recognized as posterior-lateral or so-called combined sclerosis of the cord. There is no reason why this man cannot have both combined sclerosis and syphilis at the same time. The fact that a man has syphilis doesn't prohibit him from getting a lot of other things."

This witness gave no other testimony concerning the cause of plaintiff's affliction. Neither did he say anything as to the frequency of its occurrence as an occupational disease. In effect he testified that he found in plaintiff all the cardinal symptoms of locomotor ataxia except gastric crises. He would not admit that plaintiff's testimony concerning certain stomach troubles disclosed these crises.

We pay due heed to the rule that, in passing upon a demurrer to the evidence, we should disregard defendant's evidence unfavorable to the plaintiff. But we deem it a part of a full statement of the medical testimony to say that defendant produced witnesses who testified strongly that plaintiff's affliction was locomotor ataxia, which also is a degenerative process of the spinal cord; that he did not have combined sclerosis; that a sclerosis in the cord is only an instance in the course of certain toxic causes and is not a clinical entity as is locomotor ataxia.

█ I. In our opinion, the demurrer should have been sustained because there was no evidence that the disease which plaintiff contracted was peculiar or incident to the work or process carried on. Such evidence is essential to the proof of an occupational disease not only under the common law, but under compensation statutes, which sanction awards for illness, and also under statutes which, as in Missouri and Illinois, afford a remedy independent of the compensation statute. At common law an employee had no right of action against an employer for damages arising from disease contracted in the course of his employment as an incident thereto in the absence of a showing of negligence on the part of the employer. [Jones v. Rinehart & Dennis, Inc. (W. Va.), 168 S. E. 482, l. c. 484.] This originally was the limited meaning of the phrase "occupational disease." This restricted sense of the term as well as the peculiar incidence of the

disease to the employment was thus stated by the Iowa Supreme Court In Dille v. Plainview Coal Co. (Iowa), 250 N. W. 607, l. c. 616:

"An 'occupational disease' suffered by a servant or employee, if it means anything as distinguished from a disease caused or super-induced by an actionable wrong or injury, is neither more nor less than a disease which is the *usual incident or result* of the particular employment in which the workman is engaged, as distinguished from one which is caused or brought about by the employer's failure in his duty to furnish him a safe place to work. If the employer fails to provide a reasonably safe place to work, or fails to observe the specific requirements of the statute with respect thereto, and, as a result of such neglect, the employee is injured, the liability of such employer cannot be avoided by calling such injury an 'occupational disease,' or by showing that disease of that nature is often the accompaniment or result of such employment, even when all due care has been exercised by the employer." Today, the term "occupational disease" applies alike to actionable and nonactionable afflictions.

Connecticut is one of the minority of American states in which the Workmen's Compensation Law permits an award of compensation for incapacity resulting from an occupational disease. The Connecticut statute defines an occupational disease as one "peculiar to the occupation in which the employee was engaged and due to causes in excess of ordinary hazards of employment as such." The Connecticut Supreme Court, in the case of Glodenis v. American Brass Co. (Conn.), 170 Atl. 146, l. c. 150, thus interpreted the statutory definition:

"To come within the definition, an occupational disease must be a disease which is a *natural incident* of a particular occupation, and must attach to the occupation a hazard which distinguished it from the usual run of occupations and is in excess of that attending employment in general. [See Industrial Commission of Ohio v. Roth, 98 Ohio St. 34, 38, 120 N. E. 172, 6 A. L. R. 1463; Victory Sparker & Specialty Co. v. Francks, 147 Md. 368, 379, 128 Atl. 635, 44 A. L. R. 363; Peru Plow & Wheel Co. v. Industrial Commission, 311 Ill. 216, 221, 142 N. E. 546.]" (Italics ours.)

In this case the plaintiff sought compensation for lead poisoning contracted in his work in a brass factory.

Illinois, like Missouri, excludes occupational disease from the benefits of the Workmen's Compensation Act. But again like Missouri, Illinois by a separate statute gives a remedy for the damages caused by such diseases. [Cahill's Illinois Stats. (1933), chap. 48, par. 185 et seq.; Smith-Hurd Illinois Rev. St. (1929), chap. 48, sec. 73, p. 1378.] Respondent rightly concedes that the Illinois statute is similar to our own. He not only concedes that fact, but he finds in it and in cases construing the act authority for his contention that the de-

murrer was properly overruled. In our opinion, the Illinois statute, similar to our own as we shall see, gives force to the point that the demurrer should have been sustained. The Illinois statute is as follows:

"That every employer of labor in this State, engaged in carrying on any work or process which may produce any illness or disease *peculiar* to the work or process carried on, or which subjects the employees to the danger of illness or disease *incident* to such work or process, to which employees are not ordinarily exposed in other lines of employment, shall, for the protection of all employees engaged in such work or process, adopt and provide reasonable and approved devices, means or methods for the prevention of such industrial or occupational diseases as are incident to such work or process." (Italics ours.)

In Montagne v. Belleville Enameling & Stamping Co., 249 Ill. App. 567, plaintiff recovered judgment for $12,500 for injuries to his health claimed to have been sustained by reason of having contracted silicosis while in the employ of defendant as a sandblaster. The suit was based upon the section of the Illinois Occupational Disease Act which we have quoted. The judgment was affirmed. His business was to sandblast castings in preparation for enameling. While in this work, he became afflicted with silicosis. There was much testimony as to the causal relation between plaintiff's work and his disease, silicosis. After reviewing the medical testimony and quoting from Jannusch v. Weber Bros. Metal Works, 249 Ill. App. 1, the court, concluded (249 Ill. App. l. c. 575):

"After careful examination of the record in the present case we are of the opinion that the evidence is sufficient to establish the fact that appellee (plaintiff) suffered from silicosis or sandblaster's disease contracted while in the employ of appellant (defendant) and that such disease is *peculiar* to those engaged in sandblast work to which workers are not ordinarily exposed in other lines of employment." (Italics ours.)

In Jannusch v. Weber Bros. Metal Works, 249 Ill. App. 1, plaintiff recovered judgment for damages under the Illinois Occupational Disease Act, arising out of tuberculosis contracted while working for defendant. As in the instant case, so, in the Illinois case the defendant raised the question of the sufficiency of the evidence. The record showed that plaintiff, a healthy youth, raised on a farm, worked for defendant for a year and a half as a spinner using a lathe on brass products and also using emory cloth to remove scratches. Floating metallic dust was inhaled. There was abundant medical testimony, supported by X-ray pictures to show that plaintiff had contracted tuberculosis. There was also medical testimony to prove that tuberculosis was one of the most widespread diseases known; that any oc-

cupation where dust is produced is hazardous because it lights up and brings about tubercular disease by irritating the lungs or irritating the glands in the neck. "But some kinds of dust are more dangerous than others. Some varieties of dust or particles have sharp edges and they damage the lung tissue to a greater degree than others, while some varieties of dust are of a poisonous nature. For instance, dust derived from zinc, brass and lead are more hazardous than just simply dust. This dust sets up an inflammation in the respiratory tract and, if the tubercular germ is present, it may lodge in the inflamed area and consumption will result."

The court, in its opinion, further said: "As to what is an occupational disease within the meaning of the statute, the answer is found in Section 1 of the statute (cited), which in substance provides that every employer engaged in carrying out any work or process which might produce any illness or disease peculiar to the work or process carried on, or which subjects the employees to the danger of the illness or disease *incident* to such work or process to which employees are not ordinarily exposed in other lines of employment, shall provide certain means for the protection of such employees from these diseases.

"The evidence shows that tuberculosis is not an illness which is exclusively caused by conditions such as those under which plaintiff worked, but we think the evidence does establish that the disease of tuberculosis is an illness to which employees in the kind of work plaintiff was doing are *peculiarly liable*."

In the case of Wilcox, Admr., v. International Harvester Co. of America, 278 Ill. 465, 116 N. E. 151, judgment in favor of plaintiff under the Illinois Occupational Diseases Act, for damages for the death of her intestate was affirmed. Concerning the issues the Supreme Court of Illinois said:

"Three questions of fact arose in the case, each of which involved the ultimate right of defendant in error's intestate to recover: (1) Whether lead poisoning is incident or peculiar to the work of a setter or distributor of type within the meaning of the statute; (2) whether plaintiff in error used such care in providing reasonable and approved devices and means for the prevention of lead poisoning as is required by the statute; and (3) whether defendant in error's intestate was suffering from lead poisoning." The court held that there was sufficient evidence for the jury to find that each of these questions of fact had been proved.

It is quite clear from these and other Illinois cases which we could cite that some evidence of the peculiarity and incidence of the particular disease suffered to the work done was necessary to the case made.

Section 13252, Revised Statutes 1929 (7 Mo. Stat. Ann., p. 4803), which is similar to the Illinois Statutes, is as follows:

"That every employer of labor in this state engaged in carrying on any work, trade or process which may produce any illness or disease *peculiar* to the work or process carried on, or which subjects the employee to the danger of illness or disease *incident* to such work, trade or process, to which employees are exposed, shall for the protection of all employees engaged in such work, trade or process, adopt and provide approved and effective devices, means or methods for the prevention of such industrial or occupational diseases as *are incident to such work, .trade or process.* [R. S. 1919, sec. 6817.]'' (Italics ours.)

It will be observed that our statute limits the rights created to ''any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or disease incident to such work,'' etc., and that it imposes upon the employer the duty to provide devices ''for the prevention of such industrial or occupational diseases as are incident to such work, trade or process.''

It should be borne in mind that the term ''occupational disease'' has the same meaning under the common law, under statutes separate from the Compensation Law, and under that large number of cases in many jurisdictions arising under compensation statutes where the question is whether the employee suffered a compensable injury or had contracted a noncompensable illness. The case of Lovell v. Williams Bros. (Mo. App.), 50 S. W. (2d) 710, l. c. 713, was of the latter class. The opinion of the St. Louis Court of Appeals thus defines an occupational disease:

''It is obvious that there is nothing in the evidence to sustain a finding that plaintiff suffered from an occupational disease. Such disease is defined to be a disease contracted in the usual and ordinary course of events, which, from the common experience of humanity, is known to be incidental to a particular employment. It ordinarily results from long-continued work in the particular employment. [Industrial Commission v. Roth, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463.]''

The cited case of Industrial Commission v. Roth is of the same class of cases as the Lovell case and is one of the leading authorities in this country on the conditions under which death from disease may be compensable as an injury. The opinion in the Roth case thus limited the term ''occupational disease,'' 6 A. L. R. 1463, l. c. 1466:

''We are therefore of the opinion that the term 'occupational disease' must be restricted to a disease that is not only incident to an occupation, but the natural, usual, and ordinary result thereof; and held not to include one occasioned by accident or misadventure.''

The only effect of the Occupational Diseases Act is to change the

measure of the master's duty, as the Illinois Court of Appeals said in May v. Belleville Enameling & Stamping Co., 247 Ill. App. 275, l. c. 282: ''The duty of the master has been changed. He may no longer use such machinery and appliances as he chooses. The measure of his duty is no longer reasonable care to furnish a safe place, safe machinery and tools, but, in addition to such reasonable care, he must use in his business the means and methods required by the statute. [Streeter v. Western Wheeled Scraper Co., 254 Ill. 244, 256.]'' It should follow from this and the other authorities cited that the meaning and the restrictions of the phrase, ''occupational disease'' are, substantially the same under our statute and in the common law sense. And, of course, occupational diseases are not a separate class of human ailments. In 37 Yale Law Journal, page 588, we read: ''Of occupational diseases, it is to be remembered all the time that they do not differ essentially from diseases of a different origin. As said by Dr. W. Gilmore Thompson in the pioneer work on the subject in this country (Thompson Occupational Diseases (1914), 48, 49): 'Occupational diseases are not new diseases from the ultimate pathological standpoint.' '' And this sameness of diseases whatever their origin makes hard and grave the task of determining whether under the evidence in a given case it was a question for the jury that an ailment was an occupational disease.

In the particulars in which we find plaintiff's case to be wanting in essential evidence of an occupational disease we may look alone to the testimony of Dr. Hoge. For Dr. Barnes, plaintiff's other expert witness, assumed that plaintiff's mode of work was the cause of the combined sclerosis which these physicians found in plaintiff. The hypothetical question submitted to Dr. Hoge was based on plaintiff's testimony of the conditions under which plaintiff worked with and about the chemicals named and on his testimony of the change in his health included symptoms exhibited. The question concluded with the inquiry: ''What was your diagnosis considering those facts and your examinations?'' He answered: ''I believe that Wolf was suffering from a nervous disorder consisting in a degeneration of the spinal cord that is known as combined sclerosis.'' And then there was the further question and answer:

''Mr. Pinter (Q): Doctor, considering this history that I have just read to you, and the fact that you found this—on examination whatever it disclosed to you in the fact that he worked for the last year continuously in zinc sulphate and zinc stearate—what, in your opinion, was this combined—is this combined sclerosis due to? A. I believe as a matter of information and not of personal experience, that zinc in almost any form—

''The Court (Q): You said that before. What is it due to? Don't let us have a dilation. A. It could be due to absorption of zinc.''

In plaintiff's examination of Dr. Hoge leading up to the preceding question and answer, plaintiff inquired whether the dust of zinc sulphate would have any effects on the human organisms. The doctor answered that he knew what the authorities said in a general way. And finally, as we have already stated, Dr. Hoge, on cross-examination said: "I have never had a case of a man who had contracted combined sclerosis from zinc poisoning." We do not find in this testimony any evidence whatever that combined sclerosis is an illness or disease peculiar or incident to the work or process carried on. In fact Dr. Hoge's testimony concerning the rarity of the disease in the industrial sense tends to prove that it is not incident to the work or process.

Our own researches confirm Dr. Hoge's statement that he never had a case of combined sclerosis caused by zinc poisoning. The Report of the Committee on Standard Practices in the Problem of Compensation of Occupational Diseases of the Industrial Hygiene Section of the American Public Health Association (1931) is a history of the extension of the Workmen's Compensation Laws to include occupational diseases. It contains an examination of the laws of European countries; of the British Empire, of South and Central America and Mexico, of the several states of the United States, and of our Federal Government. It abounds in schedules of occupational diseases but combined sclerosis is not listed in any schedule of any state or country. The chairman of the committee making the report is Henry M. Kessler, M.D., Medical Director of the New Jersey Rehabilitation Clinic and formerly Medical Adviser of the New Jersey Compensation Bureau. The report has a place in the best public law libraries. As an example of the multiplicity of compensable diseases Kessler's Report, page 104, lists seventy-six different forms of illnesses, for which, under decisions appearing in the New York reports 1923 to 1929, compensation was allowed. Combined sclerosis is not among them. Multiple sclerosis is there listed, but plaintiff in the instant case was diligent to distinguish the combined from the multiple.

We stress this industrial rarity of the disease of which plaintiff complains not by way of saying that combined sclerosis is not or may not be an occupational disease. Our statute does not bracket diseases with occupations and thus limit the right of recovery as do the laws of some states and countries. [See Kessler's Report.] Therefore, with the support of substantial evidence tending to show that combined sclerosis is peculiar and incident to the work or process, it would be an occupational disease for which recovery might be had under the statute. And with substantial evidence that it is "a disease contracted in the usual and ordinary course of events, which from the common experience of humanity is known to be incidental to a particular employment" (Lovell v. Williams Bros., supra), com-

bined sclerosis would be an occupational disease under the common law. But we see in the rarity of combined sclerosis an emphasis, or aggravation, if you please, of the prejudicial error of submitting this case to the jury in the absence of any evidence of the kind which we hold to be essential to a case made. These absent elements of proof are, as we have said, that combined sclerosis is peculiar and incident to the work or process. The opinion testimony of Dr. Hoge, founded on the hypothetical questions and his examinations made in preparation for the trial, does not supply the missing links.

■ Webster's New International Dictionary defines "incident" as "liable to happen, apt to occur; befalling; hence naturally happening or appertaining." This court gave its understanding of the meaning of the word "peculiar" in the case of St. Louis M. & S. E. Railroad Co. v. Continental Brick Co., 198 Mo. 698, 96 S. W. 1011, which was a condemnation suit for land for a right of way. In one of the instructions given there were enumerated various items to be considered in assessing damages, "and generally all matters owing to the peculiar location of the railroad over defendant's land," etc. Objection was made to the use of the word "peculiar" and this court observed (198 Mo. 698, 96 S. W. 1. c. 1015): "Whilst the word 'peculiar' sometimes has an offensive meaning, yet its natural and usual meaning is particular or special, and that is the same in which it was used in this instruction."

Our insistence upon evidence that a disease, to be occupational within the meaning of the Missouri statutes, is peculiar and incident to the work or process is supported by the world history of compensation to workmen for diseases contracted in the course of their employment. Switzerland which was the first country to protect by law its workers against industrial disease, provided by an Act of 1877:

"The Federal Council shall also specify those industries the exercise of which demonstrably and exclusively gives rise to specific dangerous diseases, to which liability as defined for accidents shall extend." Later the word "exclusively" was changed to "exclusive or substantially." The British Act is based on scheduled diseases and occupations, bracketed together, and provides that a worker if he contracts a disease mentioned in column one of the third schedule, while employed in a process mentioned opposite that disease in column 2, is presumed to have contracted his disease at his occupation. However, if he contracts a scheduled disease while employed in some occupation not mentioned opposite the said disease in column 2 of the schedule the burden of proving that his disease is of occupational origin lies upon the workman. But he is in no way debarred from claiming compensation under the act because his occupation is not mentioned in the appropriate place in the schedule. [Kessler's Report, p. 29.]

When the several states of our Union, following in the footsteps of progressive European counties, began to enact statutes for the compensation of disabled workmen without regard to the common-law liability of the employer, they showed a reluctance to include occupational diseases within the beneficent scheme. The laws were limited to accidental injuries arising out of and in the course of the employment. Kessler in his report (p. 1) thus explains:

"In the formulation of these laws, it is interesting to observe that the two earliest laws passed covering employers' liability for industrial accidents—Switzerland, 1877 and Germany, 1883—provided there and then for the inclusion of industrial diseases. Just why this seemingly logical interpretation of the scope of workmen's compensation laws later fell upon evil days becomes more or less apparent when the legal arguments relating to the drafting of some of the subsequent laws is reviewed. The chief objection upon any sound basis against too freely admitting industrial diseases within the meaning of the law was the difficulty of determining with any degree of accuracy the causal connection between diseases of gradual onset and slow development and the occupation of the victim. Disability to work is the only manifestation of occupational injury which is compensable under the law, and disability from disease often does not ensue for several months, sometimes not for years. By the time disability is established, the diagnosis of its chain of causes may be obscured, and the workmen affected may have changed occupation or employer several times over." When the states began to broaden the scope of their compensation statutes so as to include occupational diseases some of them limited compensable disease to certain ailments contracted in specified employment. So it is that, excluding four states which have no compensation laws, there are thirty-four states and one territory in which occupational diseases are excluded from compensation. There are ten states and the District of Columbia, the United States and three territories to which the Compensation Act has been specifically extended to include occupational diseases. The act of four of these states (California, Connecticut, North Dakota and Wisconsin) and of the District of Columbia, the United States, the Philippine Islands and Hawaii include occupational disease generally. The acts of five of these states (Illinois, Minnesota, New Jersey and Ohio) and of Porto Rico include occupational diseases by means of a schedule listing the compensable occupational diseases. [Kessler's Report, p. 59.] By way of example of bracketed and scheduled diseases the Minnesota statute provides: "(9) For the purposes of this act only the diseases enumerated in column one, following, shall be deemed to be occupational diseases." Then follows: "Column one, Description of Diseases," which are scheduled, and, parallel to Column One, "Column Two Description of process," with an appropriate

schedule. In like manner the New York Act provides: "2. Occupational diseases. Compensation shall be payable for disabilities sustained or death incurred by an employee resulting from the following occupational diseases." There follows parallel columns of diseases and processes. Our Missouri statute is not so precise or rigid, but it contains the principle of requisite evidence of causal relation between the disease and the employment which the statutes cited provide by their schedules. We may add that, so far as our research shows, Missouri and Illinois are the only states which have occupational diseases statutes, wholly independent of their compensation acts.

Plaintiff calls to our notice the opinion of this court in the case of Boll v. Condie-Bray Glass & Paint Co., 321 Mo. 92, 11 S. W. (2d) 48. In that case the constitutionality of the occupational diseases statutes were upheld. That question is not in this case. The court, without summarizing the evidence, held it to be sufficient. And, finally, the court in its opinion in the Boll case said (321 Mo. 1. c. 101, 11 S. W. (2d) 1. c. 52):

"It is a fact generally known, and courts will take judicial notice of it, that the inhaling of fumes, dust and gases, which result from the mixing of substances used in the manufacturing of paint will produce what is generally known as 'painter's colic,' that the disease is accompanied by great pain and often results in permanent injury to the person afflicted therewith." Judicial notice is the cognizance of certain facts which judges and jurors may properly take and act upon without proof because they already know them. [23 C. J. 58.] The court in the Boll case quite properly took judicial notice of the facts stated. The reports abound with lead poisoning cases. The statutes which schedule diseases and employments do not fail to bracket "lead poisoning or its sequelae" with "any process involving the use of lead or its preparations or compounds." But in the instant case we cannot take judicial notice of combined sclerosis or its causes, and we do not find that the views which we have expressed are in conflict with the Boll case.

II. In view of the fact that the judgment is to be reversed and the cause remanded for error of the trial court in overruling defendant's demurrer, we will make some observations on the points for and against the demurrer for the guidance of the court below in another trial.

It does not follow from what we have said that the demurrer should have been sustained because there was no evidence on behalf of plaintiff that other employees had been afflicted with an occupational disease or because there was evidence on behalf of defendant that other employees had not been thus damaged. The fact that

other employees of defendant did not contract an occupational disease is a matter of defense. But it is not a complete defense. Neither should plaintiff, in his proof of the missing elements mentioned above be restricted to evidence that other employees of defendant had contracted an occupational disease under the conditions under which plaintiff worked.

If the case made were submissible in the particulars which we have found to be wanting, it was for the jury to find, under the evidence and proper instructions, whether defendant was subject to the several sections which make up the Occupational Diseases Act.

■ III. Mrs. Wolf, wife of plaintiff, went to work in defendant's plant after her husband had quit his employment there. She was permitted to testify, over objection, to conditions prevailing while she was so employed subsequent to the time when plaintiff charged he had suffered injury. The admission of this evidence was prejudicial error. [Minea v. St. Louis Cooperage Co., 179 Mo. App. 705, 162 S. W. 741, and cases there cited.]

IV. Under the evidence plaintiff's Instruction No. 1 is not subject to the objection that it permitted the jury to find that plaintiff was employed about chemicals emitting poisonous gases, etc., "in harmful quantities and under harmful' conditions." But on a retrial plaintiff's instructions should conform to the law stated in our ruling upon the demurrer.

V. The objection to plaintiff's Instruction No. 2 is well taken. The error of that instruction was not cured by defendant's given Instruction No. 11. [State ex rel. Long v. Ellison, 272 Mo. 571, 199 S. W. 984.]

■ VI. Defendant's objection to plaintiff's Instruction No. 7 presents a more difficult question. The objection is that the instruction permitted the jury to find that defendant was guilty of negligence in failing to post notices of known dangers, and "known means of avoiding, so far as possible, the injurious consequences thereof," without requiring the jury to find that there were any such means of avoidance or that defendant had any knowledge thereof, "thereby omitting an essential element of the negligence as defined in the statute." The instruction is founded on Section 13264, Revised Statutes 1929 (7 Mo. Stat. Ann., p. 4809). The statute provides that "For the purpose of disseminating a general knowledge of the provisions of this article and of the dangers to the health of employees in any work or process covered by the provisions of this article, the employer shall post in a conspicuous place in every room or apart-

ment in which any such work or process is carried on, appropriate notices of the known dangers to the health of any such employees arising from such work or process, and simple instructions as to any known means of avoiding, so far as possible, the injurious consequences thereof.''

Plaintiff insists that the assailed part of the instruction is good because it is in the exact language of the statute, citing Kippenbrock v. Wabash Railroad, 270 Mo. 479, l. c. 485-6, 194 S. W. 50. Instructions are to be ''on any point of law arising in the case.'' [Sec. 967, R. S. 1929.] Not every instruction can be considered free from error merely because it is in the language of the statute, especially if that language calls for judicial construction. The word ''known'' is defined as ''familiar; perceived; recognized; understood; especially, when used absolutely, familiar to all; generally understood or perceived. According to the context the word 'known' may refer to both actual and, constructive knowledge.'' [35 C. J. 917.] The Occupational Diseases Act was approved March 27, 1913. [Laws 1913, p. 402.] The General Assembly, by that act intended among many other things, to promote and disseminate a general knowledge of the dangers to the health of employees. It recognized that, in the course of years, such knowledge would grow and progress, even as the commercializing by industry of new discoveries of science would go forward. Every one knows that, since the enactment of that act there have been discovered many new processes of manufacture, subject to the act, which were unknown in 1913. It is also true that today there are known methods of protection from the dangers contemplated by the act which were not known in 1913. In our opinion, the word ''known'' as used in Section 13264, in the phrases ''known dangers,'' and ''known means,'' cognotes dangers and means known at the time of the enactment of the act, and also known, from time to time thereafter with the growth of knowledge of dangers and means, and with the development of industry creating new dangers and producing knowledge of new means of protection from dangers. The instruction therefore should have required the jury to find that the dangers were known or could have been known to defendant, and that the means of avoiding the dangers were known or could have been known to defendant. But of course the instruction should not have been limited, as defendant contends, to a finding ''that defendant had any knowledge thereof.'' If knowledge of dangers or of means of avoiding them was available, the law would not permit defendant to set up as a defense its want of knowledge of the dangers and means of avoidance.

VII. Over objection of defendant, Dr. Gradwohl, a laboratory diagnostician, was permitted to testify from a copy of a record of

his office concerning a test of plaintiff's blood which, the copy indicated, was made in the doctor's laboratory, more than seven years before the day of trial. The doctor did not remember Wolf, nor his case, nor whether he himself or one of his staff took the test. There was not in his testimony any sign of a memory refreshed. But under the privilege of refreshing his memory the doctor brought before the jury the contents of a copy of a private record of his office. The objections of defendant should have been sustained.

VIII. For the reason that the trial court erred in overruling defendant's demurrer, the judgment is reversed and the cause is remanded for a new trial. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.