CATHERINE E. HARWARD *v.* J. BURLEIGH HARWARD

[No. 64, October Term, 1937.]

*Decided January 12th, 1938.*

The cause was argued before BOND, C. J., URNER,

OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHN-SON, JJ.

*Eldridge Hood Young* and *Z. Townsend Parks, Jr.*, with whom were *John S. Young* and *Young & Crothers* on the brief, for the appellant.

*Ernest Volkart,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married January 3rd, 1925, at St. Patrick's Church in Washington, D. C., and lived together until the summer of 1934, when J. Burleigh Harward, the appellee, left the common home at Bush River, in Harford County, and has since lived apart from his wife.

After their marriage in 1925, Harward and his wife, Catherine E. Harward, the appellant, lived for a time in Baltimore, then they removed to Bel Air, in Harford County, then back to Baltimore, where they lived for a time, and then back to Harford County. Harward is employed by Sisk & Son as a saleman at an annual salary of $3,500, and has an office in Aberdeen, in Harford County. In 1930, Nancy, the first child of the marriage, was born.

At some time, apparently prior to 1934, he acquired possession of a six-room bungalow at Bush River, a short distance east of Abington, on the Philadelphia Road, which he, his wife, and the little girl Nancy, occupied until he left the home in July or August of that year. After he left, Mrs. Harward and Nancy continued to occupy the bungalow until some time in the fall of 1934. It was heated only by an open fireplace, and as the weather became colder Mrs. Harward was forced to seek another home for herself and Nancy. She went first to her mother's home in Laurel, where she left Nancy for a few days, to go, she said, to see her husband about arranging a home for the future. After that she lived at different times at Barcroft, Virginia, at

College Park Inn, and at Terrapin Inn, at College Park, Maryland, at Havre de Grace, again at the bungalow at Bush River, and finally at Rosecroft Terrace in Baltimore, and she was confined for a time at the Bon Secours Hospital. While she was living at the bungalow, on her return there in 1935, on July 23rd, of that year, her second child, Mary Elizabeth, was born.

On the 11th of October, 1935, J. Burleigh Harward, the husband, filed the bill of complaint in this case against his wife, in which he charged:

"That although the conduct of your Orator toward his wife the said Catherine E. Harward, has always been kind, affectionate, chaste and above reproach, the Defendant Catherine E. Harward, compelled your Orator by her cruel treatment, vicious temper and threatened violence to leave in the latter part of July, 1934, the home he was occupying with said Defendant at Bar Harbor in Harford County, State of Maryland, since which time he has not lived or cohabited with the said defendant.

"5. That since your Orator has been compelled to leave the said Defendant, she, the said Catherine E. Harward, has committed the crime of adultery with a person whose identity is at this time unknown to your Orator, as a result of which adultery the said Catherine E. Harward, Defendant herein, was delivered of a female child on July 22nd, 1935, and that your Orator has not lived or cohabited with the defendant since the latter part of July, 1934, nor has he condoned the misconduct of the said Defendant."

The defendant answered, denied those charges, and the case was tried on the bill, answer, and testimony. At the conclusion of the trial, the court decreed: (1) That the husband be divorced *a vinculo matrimonii* from the defendant; (2) that she be awarded custody of their child, Nancy; that the husband pay to her for its support $12.50 per week; and (3) that the custody and maintenance of the child remain subject to the further order of the court.

This is the wife's appeal from that decree.

The husband, in support of his bill, testified that he had had no sexual intercourse with his wife after their separation in the summer of 1934; he contended that the birth of a child on July 23rd, 1935, was therefore conclusive proof that she had been guilty of adultery; and he said that she had on more that one occasion admitted that to him. A motion to strike that testimony out was overruled on January 30th, 1937, and on August 19th, 1937, after the appeal was taken, the testimony was filed in the court. Except for the husband's testimony that he had not had marital relations with his wife after their separation, there was no evidence of any kind tending to prove that the wife had been guilty of adultery; no effort was made to show that she knew or had even spoken to a man other than her husband and her physicians during the separation; so that the decree rests solely upon the finding that the child, born on July 23rd, 1935, was conceived at a time when there was no possibility of marital intercourse between the husband and wife, and the necessary inference that some person other than the husband was its father.

The issues in the case were: (1) The possible period of gestation; and (2) possibility of intercourse between the husband and wife at or about the inception of that period.

No evidence was offered in respect to the first issue, but both sides appear to have accepted the view that the period of gestation in human beings is a matter of such common and exact knowledge that courts will take judicial notice of it. The predicate of that conclusion is unsound. Knowledge of the fact is neither common nor exact, but, on the contrary, the period of gestation has not only been the subject of extensive investigation and of differing conclusions, but its use in connection with the issue of legitimacy has been limited by statutes which fix its extent differently in different countries. So the French law allows the legitimacy of a child born 180 days after marriage and 300 days after the death or non-

access of the husband; the Prussian law declared a child legitimate born 302 days after the husband's death; in Scotland legitimacy was established if the child was born within ten months after the death of the husband. *Reese, Medical Jurisprudence & Toxicology,* 255. Reese also states: "There is a diversity of opinion among obstetricians of the highest reputation on the subject of the natural period of gestation—varying from 274 to 301 days. It may be assumed that the average period is between thirty-eight and forty weeks." That irregularity has been confirmed not only by the observation of human beings, but finds corroboration in the course of gestation in the lower animals such as cows, sheep, mares, and cats. Reese states that: "In the cow the average period of gestation is about 285 days; yet, from Dr. Krahmer's tables, it is found that, out of 1,105 cows, 335 calved on the fortieth week, 429 on the forty-first week, and 135 on the forty-second week; the balance varied from the thirty-eighth week to the fifty-first week—a period of about 90 days." *Ibid,* 149.

In 3 *Wharton & Stillé, Medical Jurisprudence,* page 24, it is said: "Since the earliest historic times the normal duration of the period of gestation in woman has been held to be approximately nine calendar months, or ten lunar months. But the exact number of days necessary for the complete development of the fetus will remain open for discussion. The period is apparently not the same in all women, varying even in the different pregnancies of the same woman. The great difficulty in determining the duration of pregnancy arises from the fact that while the one end of gestation can be determined by the day of delivery, the other end is always a matter of uncertainty." The same author, in dealing with the method of reckoning from the cessation of the menses, says: "The general rule of Naegele is followed by most obstetricians. According to that we count ahead nine calendar months and add seven days to the date on which the last menses appeared. That computed date is the one on which labor may be expected; but a latitude

of a week before or after that day must always be allowed to include the majority of cases; only a very few will fall on that particular day. As a basis for that rule the period of gestation is taken as 280 days. Here it must be remembered that ovulation may be a month off from the appearance of the menstrual flow, as shown by Leopold's studies; also that pregnancy may begin after the menses have been suspended for some other reason for a longer or shorter period; and still further, the menses may continue during a portion, or even the entire pregnancy. However, from what has been supposed normal cases, various writers have estimated the duration of pregnancy from the last day of the menses as follows:

| Author | Mean | Minimum | Maximum |
|---|---|---|---|
| Devielliers | 280 to 290 | 250 | 310 |
| Reid | 274 to 280 | 255 | 315 |
| Murphy | 281 to 287 | 252 | 326 |
| Merriman | 274 to 280 | 252 | 326 |
| Gaston | 267 to 273 | 246 | 308 |
| Auvard | 272 to 282 | 249 | 328 |

"Estimating a mean from these cases, Auvard finds the average duration of pregnancy from the end of the last menses to be from 275 to 282 days, with a minimum of 246 (Gaston), and a maximum of 328 (Auvard)."

These references are not made to supply a substitute for proof not found in the record, but to illustrate the conclusion that neither the mean nor the extremes of the period of gestation in a woman is so commonly and precisely known that the courts may take judicial notice of them for the purpose of supplying a basis for a judicial judgment or decree which will determine the status or the rights of parties to a marriage or the issue thereof. While, therefore, as stated by *Reese* (page 248), there is a "usual popular notion" that the period comprises nine calendar months or ten lunar months, there is no legal basis, either in the evidence or in any knowledge so common and definite that the courts may take judicial notice of it, for the appellee's statement "that conception must have taken place between October 16th and October

26th, 1934, to cause the birth of a normal child." On the contrary, the period of gestation in this case should have been established as nearly as might be by competent medical evidence. In the absence of such evidence the court is without proof or presumption on the point.

Turning now to the evidence which does appear in the record, it is found to relate exclusively to the husband's attempt to prove that he had no opportunity for marital intercourse with his wife within the possible limits of the period within which the conception which resulted in the birth of the second child must have occurred.

He himself was his only witness in support of that contention, and his testimony may be thus summarized: He left his wife, he said, because she "nagged" him; that there was "just a habitual fight" over the fact that he had to be away so much at his work. He said he left the latter part of July, 1934, and did not return to the bungalow except on two occasions; one before Labor Day, and one on Labor Day. He saw her once in College Park, and once in Barcroft, Va. These visits were all apparently in the fall of 1934. On cross-examination, however, he admitted that at Christmas, 1934, he saw his wife at her mother's home in Laurel and drove her and Nancy to Havre de Grace. In the early winter of 1935 she was living in Havre de Grace, and later lived for a while at the bungalow. In 1936 she had moved to Baltimore and he visited her twice there.

In his testimony he gave this description of one of those visits:

"Did anything occur on either one of those visits? You said you were there twice? A. Yes. Nothing that I recall except one of her usual fainting spells when she asked me to come back and live with her and I refused to do it, then there was a lot of conversation from her as to why I should, and so forth, and then a fainting spell and the lady of the house came in and I left. Q. You only went there twice? A. Yes, sir. Q. And you say you recall nothing but her usual fainting spells on both occasions? A. No, I don't say that. Q. On one occasion?

A. On one occasion. That was not the faint, it was just a fall-down. She was perfectly all right. Q. I meant when I designated it, I designated as you did the usual fainting spell. A. The usual bluff would be the better way to put it. Q. Well, the usual bluff. What happened on that occasion? A. That was the day that she told me that I was not the father of that child. Q. Did she have a fainting spell then? A. No. Q. Did she tell you who the man was? A. She did not. Q. Did you ask her? A. I don't know that I did that day. Q. Did you treat that as the same kind of a thing as the fainting spell, as a bluff or not? A. That was not the day. Q. No; but you characterized the other spell, or whatever happened, as a fainting bluff; did you consider this to be a bluff, too? A. No, sir, I did not. She was perfectly natural in every way and talked as nice as could be about the whole thing that day. Q. And yet you can't recall whether you asked who the father was or where he lived or anything about it? A. I expect I did ask her because I have asked her many times. Q. Many times since then? A. Many times since then. Q. When did you ask her about that? A. She has been to my office a dozen times since to worry me. Q. And every time she came to the office she admitted you were not the father of the child? A. I did not ask her a dozen times. I have only asked her once since— Q. You said she said it on a number of occasions after that. A. I did not say she admitted it on a number of occasions, one occasion. Q. I thought just now you said she admitted it on a number of occasions? A. No. * * * Q. Did you do anything to your wife to make her faint on that first call? A. No, sir, I did not. Q. Did you use any indecent language to her? A. No, sir. Q. Did you ever use any indecent language to her? A. What do you call indecent language? I have used curse words at times, swear words."

He was also permitted to testify that his wife admitted to him that he was not the father of the second child, and that she first made that admission in February, 1936. The only evidence tending to corroborate his testimony

was a series of letters addressed to him by his wife, which showed that on respective dates of those letters Mrs. Harward was not in Harford County. One letter from Mrs. Harward, sent from College Park October 10th, 1934, expressed regret that she and Nancy were not in when Harward called, which ended thus: "You will be welcome to come down and spend this week-end; you could sleep with Nancy and I could sleep by myself." One from Mrs. Harward, sent from College Park October 17th, 1934, telling him when Nancy would be ready to leave, and suggesting that mail be addressed to the writer at Laurel. Letters dated October 5th, 1934, and November 2nd, 1934, and October 31st, 1934, indicating that the writer was in Washington on those dates and was expecting Harward to bring Nancy to Barcroft. On December 18th, 1936, Harward wrote his wife from New York as follows: "Catherine, received your letter but had to leave on road trip so unable to see Nancy. Hope she is better and that I will be able to get her about Jan. 3rd. Expect to be away until 28th or 29th so cannot take Nancy for Christmas. I will however see that her presents are delivered Tues. or Wed. night before Xmas. Christmas wishes to all. J. B. Harward." And on February 24th, 1935, he wrote her this letter: "Catherine, went over to see Nancy at 12:30 and you had her out. Am enclosing checks dated 2/23 and another 3/2 for next week. I am going away and won't be home for at least two weeks. Answer my letter so I'll have it when I get home. Love to Nancy. Burleigh."

He was permitted to testify that he had had no sexual relations with his wife nor opportunity for such relations after he left the home in the summer of 1934, and that she had admitted to him that he was not the father of the second child. A motion to strike out that testimony was overruled. Since the motion was deferred until the close of the whole case, before considering it reference may also be made to the testimony of Mrs. Harward. It is apparent from the record that there was no legal justification for Harward's leaving the Bush River home,

nor is there any basis for any inference that she knew that he intended thereby to terminate the marital relation between him and her. On the other hand, it may be inferred that he was tired both of his wife and his home, and preferred to live elsewhere, and that, apart from contributing to her support, he was quite indifferent to her comfort, convenience, or whereabouts, and would have welcomed any opportunity of being rid of her. That impression is strengthened by her testimony. She said, speaking of the summer of 1934: "After Mr. Harward left, of course we had rainy spells there and it is cold and we had no furnace, we had the open fire place, and Ida, the girl that was just on the stand, she and I would go out on the beach and gather all the wood we could. Of course, if it was just myself, it would not make any difference, but I called Mr. Harward on one of the calls that he said I worried him, I am sorry, but I called him to tell him that the roof was leaking very badly in the kitchen. He said he could not be bothered about it, either to make the best of it or leave there, it did not make any difference to him. May I use the word 'damn'? He said he did not give a damn whether I stayed there or moved away. I said, 'Well, I can't stay here much longer, where shall I move to?' 'I don't give a damn where you go, you can go to hell as far as I am concerned.'" He failed to deny that statement and it appears in the record uncontradicted.

At the beginning of Mrs. Harward's examination in chief she was asked whether her husband was the father of her second child. An objection to the question and to an offer to prove that the answer thereto would have been "yes" was sustained, and an exception to that ruling noted. The only reason suggested for that ruling is that the question was leading. But no objection to it on that ground was made at the time it was asked and, if the objection to it was sustained on that ground, defendant's lawyer should have been so informed, in view of the fact that the plaintiff's attorney had again and again asked questions substantially the same in form of his

client, and in view of the general rule that an objection to a question on that ground should be made before it is answered, in order that the examiner may meet the objection. 2 *Poe, Pl. & Pr.*, sec. 261, and cases cited in note 38; 4 *C. J. S. Appeal and Error*, 586 *et seq.; Carter v. Reardon-Smith Line*, 148 Md. 545, 129 A. 839. The reason for the rule against leading questions is that they may be used to convey to the witness information "in disguise," and indicate the examiner's desire to have it affirmed by the credit of the witness. *Jones on Evidence, sec.* 816. That reason was not present in this instance because of all persons the witness was least in need of information on the subject-matter of the question. Not every question embodying a material fact to which a yes and no answer may be given is leading, (*Balto. & O. R. Co. v. Black*, 107 Md. 642, 654, 69 A. 439, 72 A. 340; *Jones on Evidence*, sec. 816), but is only so when it offers, rather than seeks, information. *Ibid.* Under the circumstances, the question under consideration was not open to that criticism and should have been permitted. If the examiner had asked, "Who was the father of your child?" no possible objection could have been made on the ground that that question was leading, and yet it is not credible that the answer to it would have been different than that to which the objection was sustained. That ruling appears to have been construed by the defendant as denying her the right to testify categorically as to her knowledge of the paternity of the second child, for she was not thereafter asked, nor did she testify specifically, as to that fact, but left it to inference and presumption.

She said that her husband left the bungalow late in July or early in August, 1934, but she added that after that "He would come down at least two or three evenings every week and bring fruit for Nancy and several vegetables that I cared for that I could not get down there, papers and magazines, anything that I could not get naturally at the bungalow, and had no way to get away from there, only to walk, and he would come down at least two or three evenings a week and every Sunday

afternoon, if he were not away on a business trip. Then he would tell me from one visit to the other, he would try to make it very clear to me that he was not visiting me, that he came down to see Nancy." She also said that on one occasion he stayed all night, she thought in the "early fall" when it was cold and chilly and they had to have "the fire place going." When asked to tell whether she had spoken to her husband of her pregnancy, she said that she had, and when asked where and when that conversation took place she testified: "It may have been in his bedroom at the hotel, or perhaps in the lobby. In other words, I went over to Dr. Foley's office in Havre de Grace, and the reason I say—I am bewildered about it, but it could have been one of three places?"

"Q. Where did you say? A. In Havre de Grace or in my husband's bedroom in the hotel, because I was there on several occasions, or in the lobby, or in the dining room of the hotel, that I had spoken with him about it, and I stayed in his room. Q. Now you have told us where it was, either in his bedroom in the hotel or in the dining room? A. Yes, sir. Q. Now can you tell us when it was? A. It was some time in October. Q. Of what year? A. 1934."

She was then asked whether she visited him in his hotel in Aberdeen, and she replied: "All during that fall, because it was cold. Nancy and I had no home and that was the purpose of my visit there. Of course, he said I was pestering him, what ever you might want to call it. Naturally, when I would go up there I would not have any place to stay— Q. Did you ever mention it to him after that particular time? A. After that particular time? Q. After that fall, in the hotel room or Dr. Foley's office? A. Yes, sir, I did. Q. When was that? A. That was going down from Aberdeen to College Park in our car; I talked it over with him going down in the car. Q. When was that? A. That was some time in October. He knew he could not get me away any other way, so he drove me down in his machine to get rid of me. That was when I wrote that letter to him November 3rd, and

Mr. Harward did receive it. It was in his bureau drawer at the Hotel Huppner, and I took it out of his bureau drawer. Your Honor, may I say how I come to open his drawer?"

She further testified that she again spoke of her condition to him in February, 1935, in his office, and that "he was not interested in it, he said, and we kept on talking, and finally he picked up a hatchet and shook it in my face. He said if I came around there with another baby, he did not know what in the name of God he would do, as if he did not have enough money to keep another one. I don't know what his purpose was in saying that or if I could help it if I were going to have another one."

In her cross-examination she said that when she received at College Park a letter from Harward dated October 9th, 1934, she had been at College Park about two days. When asked about Harward's visit to the bungalow after the separation, when he stayed at the bungalow all night, she testified: "What room did he occupy? A. I could not say. Q. He did not sleep with you? A. Not that I know of; no, sir. The Court: You would know if he did, wouldn't you, Mrs. Harward? The Witness: No, I would not, your Honor, because when he would work at the office late he would come home late and I would be sound asleep and the next morning when I would awake he would be next to me, so I could not say whether he slept with me or not. Q. By Mr. Volkart: But he only stayed one night the entire night? A. As far as I remember; yes, sir."

Later, she testified: "Q. Mrs. Harward, since the separation of July, 1934, there has been no sexual intercourse between you and Mr. Harward, has there? A. Since what time? Q. July, 1934, when the separation took place. A. Since July? Q. July or first week in August? A. Well, I was just going to say it might have been some time in August. That is the reason I won't say yes or no, because I believe that was in August." And further answering the same question said: "A. I believe there has been.

Q. When did that take place? The Court: You say you believe there has been? The Witness: Well, your Honor, it is hard to remember those things. At the time I did not think I would have to put it down on a piece of paper every time my husband had been a husband to me. I did not know anything about the future. How can I remember things like that? The Court: Mrs. Harward, it is a very simple inquiry. You and your husband separated either the middle or the latter part of the summer 1934. The Witness: Yes. The Court: You said he came back after that and stayed one night. The Witness: Yes. The Court: You do not recall that he occupied the same bed. Now, the inquiry is whether from any time after that— The Witness: I say he may have. * * Q. By Mr. Volkart: Mrs. Harward, now, answer yes or no as to whether there was any sexual intercourse between you and Mr. Harward after the separation in the early or middle of the summer 1934? A. It may have been in the early fall, I don't know. I say to make me say a particular date, I am not going to do it because I don't remember it."

The question was repeated, and she then testified: "Q. Can you tell his Honor whether or not after you had left the bungalow at Bush River whether there was any sexual intercourse between you and Mr. Harward? A. After I left the bungalow? Q. While you were living at College Park or in Virginia? A. Not in College Park or Virginia, but it may have taken place in Aberdeen, Maryland, in my husband's bedroom in the Hubner Hotel. Q. When did you stay there together in the same room? A. We did not actually stay together all in the same room, I didn't say that. I said it may have taken place there. Q. Mrs. Harward, do you mean to tell the Court that, after being separated from Mr. Harward for a period of three or four months, you occupied the same bed with him anywhere, that you would not remember that? A. that is possible, yes; and it is possible that he would not remember especially that night. Q. Can you tell us when did you stay in a bedroom occupied by Mr. Harward after you had left the bungalow? A. That would have

been some time in September, I just don't know the exact date, but I have a box that has the date on, you know, in the lid, showing that I had a prescription filled; the prescription was given to me by Doctor Foley and that has the date on it. Q. You say that was some time in September? A. Yes, sir. Q. 1934? A. 1934. Q. You don't know the date? A. No, sir, I do not."

There was other testimony in the case, but it did nothing to remove the doubt and obscurity inherent in the confusing testimony of the plaintiff and the defendant, from which the only facts emerging with any degree of certainty are that the husband, with no apparent legal justification, left his wife and daughter Nancy at the bungalow at Bush River in the late summer of 1934, and has since lived apart from his wife; that he left because he was tired of her and wanted to be free from her society and demands; and (2) that the wife is a highly emotional excitable person, with no great mental capacity, bewildered by the responsibility of caring for herself and her child after her husband left her in 1934, and helpless withal.

Turning now to the motion to strike out the husband's testimony that he had had no sexual relations with his wife after he left the bungalow in 1934, and that since that time he had had no opportunity for such relations, it may be conceded that there is a split of authority as to the admissibility of such testimony. Dean Wigmore, in his work on *Evidence,* in a brilliant and spirited criticism of the rule denying the admissibility of such evidence, nevertheless appears to concede that in some jurisdictions it is "too deeply planted to be uprooted." Section 2063. So much certainly is true, but it is also true that the rule of exclusion is, in America, supported by the great weight of authority. *Jones on Evidence,* sec. 97; 7 *Am. Jur.* 640; 60 *A. L. R.* 382; 68 *A. L. R.* 421; 89 *A. L. R.* 911; and in England, so recently as 1924, Lord Mansfield's statement in *Goodright v. Moss,* 2 Cowp. 591, 98 Eng. Reprint 1258, that "it is a rule founded in decency, morality and policy that they (husband or wife) shall not be

permitted to say after marriage, that they have had no connection, and therefore that the offspring is spurious," was quoted and approved. *Russell v. Russell*, A. C. [1924] 689. There is some support for Lord Hardwick's earlier decision, in a filiation proceeding, that such evidence was admissible, but, except where the decision has been affected by statute, the overwhelming weight of authority is to the contrary. Various attempts to rationalize the rule are referred to in 7 *Amer. Jurisprudence*, 641, in which by way of summary it is said: "Prominent among the many reasons which have been given for this rule is the idea that the admission of such testimony would be unseemly and scandalous, and this is not so much from the fact that it reveals immoral conduct upon the part of the parents as because of the effect it may have upon the child, who is in no fault, but who must nevertheless be the chief sufferer thereby. It has been held that since it is not founded on the theory that the giving of such testimony is calculated to promote dissension between husband and wife, but on the broad ground of general public policy affecting the children born during the marriage as well as the parties, its operation is not affected by the fact that the husband is dead when the wife's testimony as to nonaccess is offered." In this state the rule of exclusion appears to have been first recognized in *Craufurd v. Blackburn*, 17 Md. 49, which was approved and followed in *Scanlon v. Walshe*, 81 Md. 118, 31 A. 498, 500, where it was said: "And, in our opinion, the testimony of the adulterer, when offered for the same purpose, should likewise be excluded; especially so in all cases in which it appears that the proof does not exclude the possibility or probability of access of the husband to the wife. In such cases, as Lord Langdale said in *Hargrave v. Hargrave, supra* (9 Beav. 553), there being no proof of impotency, no evidence will be admitted to show illegitimacy. To this extent, at least, we think the presumption of the legitimacy of the child of a married woman should be conclusive." In that case three children of Carlotta Walshe, born while she was

married to Florian V. Simonds, claimed as heirs of Walshe's estate, on the theory that, although she was married to Simonds when they were born, they were nevertheless the children of Walshe, whom she later married after she was divorced from Simonds. Referring to that contention, the court said: "A contention whose foundations are so contrary to good morals, public policy, and the presumptions of law can be maintained only by some statute which not only introduces 'a new law of inheritance,' as our statute does (*Brewer v. Blougher,* 14 Pet. 178 [10 L. Ed. 408], opinion by Chief Justice Taney), but which, to bring this case within its terms, must also abrogate some rules of evidence which we are not inclined either to weaken or destroy." The rule thus approved in *Craufurd v. Blackburn, supra,* and *Scanlon v. Walshe, supra,* is not affected by the statute which removed the disqualification of witnesses for interest. Code, art. 35, sec. 1; 7 *Amer. Jurisprudence, Bastards,* sec. 23, notes 21, 1. The motion to strike out the testimony of Harward as to non-access, as to his sexual relations with his wife, and as to her admissions to him that he was not the father of the second child, should have been granted.

In dealing with the remaining testimony, it must be remembered that the burden of proof was upon the appellee to establish the allegations of his bill (*Thiess v. Thiess,* 124 Md. 292, 295, 92 A. 922; *German v. German,* 137 Md. 424, 436, 112 A. 789; *Carter v. Carter,* 139 Md. 265, 114 A. 902; *Allen v. Allen,* 142 Md. 701, 121 A. 926) by evidence so clear, unequivocal, satisfactory, and convincing as to raise in an unprejudiced mind a natural and reasonable inference of guilt. *Totten v. Totten,* 150 Md. 700, 701, 137 A. 916; *Cashell v. Cashell,* 153 Md. 170, 171, 172, 137 A. 904; *Lang v. Lang,* 155 Md. 464, 142 A. 485; *Swoyer v. Swoyer,* 157 Md. 18, 30, 145 A. 190; *Barnett v. Barnett,* 144 Md. 184, 189, 125 A. 51; *Kremis v. Kremis,* 163 Md. 223, 232, 161 A. 255. The appellee failed to meet that burden and his bill should have been dismissed. Harward was unable to tell when his wife left Bush

River, but he knew she was there until late in September, 1934; after she left he admitted seeing her at College Park, at Barcroft, Virginia, and he drove her from Laurel to Havre de Grace at Christmas, 1934. She testified that after he left the bungalow he came down at least two or three evenings every week; that all "during that fall" she visited him at the hotel in Aberdeen because it was cold, and Nancy and she had no other home, and that in October he drove her from Aberdeen to College Park; that when she left Bush River in 1934 she left Nancy with her mother, telling her that she, Mrs. Harward, was going to Aberdeen to see her husband; that she "may" have had intercourse with her husband in "the early fall" of 1934, in her husband's bedroom in the Hubner or Huppner Hotel in Aberdeen. While these isolated facts appear definite enough, they are so only when isolated from a context which is vague, contradictory, and hopelessly confusing, and which, considered as a whole, is utterly inadequate to form the basis of a judicial conclusion. The husband failed to prove by admissible evidence that he had no opportunity for sexual intercourse with his wife during a period when conception could have occurred; his testimony as to places and dates was obscure, misleading, and by his own admission inaccurate. And while hers is subject to the same criticism, the burden of proof rested not upon her, but upon him. It does appear from the letters that she was in College Park on October 10th, 1934, but that is not inconsistent with her presence at Bush River a day or two before, nor with her presence in Aberdeen a few days later.

For these reasons, the chancellor should have either dismissed the bill or referred the case for further testimony. But on the record filed, this court must reverse the decree and dismiss the bill.

*Decree reversed, and bill dismissed.*