

L———— C. F———— (Plaintiff), Appellant,

v.

D———— H. F———— (Defendant), Respondent.

No. 30361.

St. Louis Court of Appeals.

Missouri.

March 15, 1960.

Motion for Rehearing or to Transfer to Supreme Court Denied April 12, 1960.

David K. Breed and Albert E. Hausman, St. Louis, for plaintiff-appellant.

Champ Stonebraker, St. Louis, for defendant-respondent.

DOERNER, Commissioner.

Plaintiff and defendant were formerly husband and wife, the bonds of matrimony between them having been dissolved by a decree of divorce of the Circuit Court of the City of St. Louis on October 7, 1953. This is an equitable action in which plaintiff, by direct attack, seeks to have *a part* of that decree of divorce set aside on the alleged ground of fraud. What the plaintiff sought, according to his petition, was to have declared null and void that part of the divorce decree requiring him to support a child born during the existence of the marriage, on the grounds that the child was not his. The chancellor entered a general judgment in favor of defendant and plaintiff appealed.

The evidence of both parties showed that they were married on July 7, 1946, at Scott

Air Force Base, near Belleville, Illinois, where plaintiff, a career airman, was stationed, and that they separated after three days and did not again live together until May 25, 1952. Plaintiff's theory of his case was that about May 1, 1952, the defendant, knowing herself to be pregnant by another man, and intending to practice a fraud upon the plaintiff, induced the plaintiff to live with her by stating that she desired a reconciliation; that she visited him at Springfield, Massachusetts, where he was stationed, and cohabitated with him from May 25, 1952, to about May 31 or June 1, 1952; that they again lived together for a couple of days in July, 1952, at the Lake of the Ozarks; that a child was born to defendant on January 9, 1953, and was a full term child; that defendant did not inform plaintiff of the birth of the child until she wrote him a letter on March 30, 1953, advising him she had given birth to a baby girl, but that she did not tell him the date on which the birth had occurred; that " * * * defendant thereafter wrote plaintiff that she intended to file suit for divorce and that she would not live with plaintiff as his wife in the future, and plaintiff believing that the child was born of the aforesaid marriage, entered his appearance to a divorce proceeding later filed by defendant against this plaintiff * * *"; that in defendant's petition for divorce she alleged that plaintiff and defendant had lived together until May 8, 1952, and that that statement was false; that the petition for divorce was dated June 22, 1953, and that defendant also alleged therein that " 'there was one child born of the marriage, R——— C———, age four months'," when in truth the child was then 6½ months old; that the decree of divorce was granted to defendant on October 7, 1953, by which defendant was awarded the custody of the child, and an allowance for its support.

Defendant's position below was that it was the plaintiff who first wrote to her, early in 1952, and that subsequently they mutually agreed to effect a reconciliation; that she thereupon visited and lived with plaintiff for about six days, starting on May 25, 1952, at Springfield, Massachusetts; that when she left St. Louis at that time she was not pregnant, and was just completing her menstrual period; that she did not menstruate again after the cohabitation in Springfield, Massachusetts; that in anticipation of living together permanently she gave up her job at the Postal Credit Union in June, 1952; that she and the defendant were again together at the Lake of the Ozarks in July, 1952, and at that time she informed plaintiff that she was pregnant; that plaintiff again visited her in St. Louis in November, 1952, at which time she was noticeably pregnant; that the child was not expected until February, 1953, but came early; that she informed plaintiff of the birth of the child before her letter of March 30, 1953; that she consulted her attorney regarding a divorce and the petition therefor was prepared at a time when the child was then four months old, but that a delay occurred, and the petition was not signed until later; and that she did not at that time notice the allegation regarding the age of the child.

This is not the usual action in equity in which relief is sought for a fraud allegedly perpetrated by the defendant. Nor was it in the nature of an action for a declaratory judgment respecting the paternity of the child. Admittedly the decree of divorce had been rendered by a court of competent jurisdiction. Of necessity, then, this was a direct attack upon that decree. However, if the nature of this action was ever considered by the parties in the trial court it was apparently lost sight of in the process of appeal, for in neither of the briefs is there any reference to the rules of law which govern a suit to vacate a judgment on the ground that it was procured by fraud. Furthermore, in view of the allegation in plaintiff's petition that he had remarried, his solicitude as to that part of the decree dissolving his marriage with defendant is understandable; but he does not attempt to explain by what legal legerdemain he expects this court, or any court, to set

aside a part of a decree of divorce on the grounds that the defendant was an adulteress, and not set aside that part which found defendant to be the innocent and injured party and entitled to the decree ending their marriage.

■ It is true that a court of equity will vitiate a decree of divorce rendered by a court of competent jurisdiction if that decree was procured by fraud. Hemphill v. Hemphill, Mo., 316 S.W.2d 582; McCarty v. McCarty, Mo., 300 S.W.2d 394; Coleman v. Coleman, Mo.App., 277 S.W.2d 866. But there is a sharp distinction as to the nature of the fraud which must be shown before a court of equity may cancel a decree of divorce. The fraud must relate, not to the merits of the action, that is, whether or not the prevailing party was entitled to the decree of divorce, but rather to some matter by which the prevailing party secured the decree. As was said in the oft-quoted passage in Jones v. Jones, Mo. App., 254 S.W.2d 260, 261:

> "* * * But for the fraud to have existed in the procurement of the judgment, it must have related, not to the propriety of the judgment itself, but to the manner in which the judgment was obtained. In other words, the fraud must have been extrinsic or collateral to the matters which either were or could have been presented and adjudicated in the original proceeding, and not merely intrinsic in the sense of having pertained to the merits of the cause upon which the judgment of the court was rendered. In short, it is not the province of this feature of equitable jurisdiction to afford the losing party a retrial of matters either tried or concluded by the original proceeding, but instead relief is limited to those instances where the fraud was of such a character as to have forestalled an opportunity for the fair submission of the controversy. * * *"

Hemphill v. Hemphill, supra; McCarty v. McCarty, supra.

A careful study and review of both plaintiff's petition and evidence discloses that the only claims made by him which might possibly be contended to be of extrinsic or collateral fraud by defendant in the procurement of the decree of divorce were:

(1) That the allegation in defendant's petition for divorce that the parties had lived together until May 8, 1952, was false, because the parties had, in fact, been separated from 1946 to May 25, 1952.

(2) That defendant induced the plaintiff to sign an entry of appearance and answer in the divorce action, and to remain away from the trial of that case, by failing to inform the plaintiff of the true date on which the child had been born.

(3) That defendant's allegation in her petition for divorce, dated June 22, 1953, that "'there was one child born of the marriage, R——— C———, age four months'," was not true, because the child at that time was 6½ months old.

■ As pointed out in Hemphill v. Hemphill, supra, and McCarty v. McCarty, supra, false averments in the divorce petition, false statements in the affidavit thereto, and false testimony in support thereof are not sufficient to warrant the relief sought. Certainly the first and third of the foregoing claims of plaintiff relate only to allegedly false averments in defendant's petition for divorce, and hence were not extrinsic or collateral to the issues in that action. The second of plaintiff's claims is of a doubtful classification, but assuming, without deciding, that it may encompass fraud in the procurement of the decree, the weakness in plaintiff's position lies in his failure of proof.

Plaintiff's only evidence as to that issue was the introduction of the copy of defendant's petition for divorce, which was undated, except for the year "1953"; plaintiff's testimony that he had received it by mail from defendant's counsel while he was stationed in Virginia, together with an entry of appearance and answer, both of

which he signed and returned; plaintiff's testimony that the first news he had of the birth of the child was defendant's letter to him, dated March 30, 1953, which was introduced in evidence; and the original of plaintiff's petition for divorce, which had been acknowledged before a notary public on June 22, 1953. Both the original and the copy of the petition contained the allegation that "'there was one child born of the marriage, R——— C———, age four months'."

Defendant's letter of March 30, 1953, is four pages long, too extensive to set forth herein verbatim. In the first part defendant acknowledges receipt of a letter from plaintiff, and stated that she had written plaintiff two letters but that they had been returned, and she did not know what address to use. Apparently answering an inquiry from plaintiff, she stated that she was getting along fairly well *"now"* (emphasis defendant's), and then proceeded to tell plaintiff that she had had a rough time when the baby was born; that "they" called her sister to the hospital and wanted the sister to notify plaintiff because they didn't think defendant would live through the night, but the sister didn't know where to get in touch with plaintiff; that the baby had to be turned and taken with instruments. That " * * * She (the baby) did not get here at the time she was expected, I fell and it didn't make me feel any better. * * * " Plaintiff's letter continues on with comments about the appearance and development of the infant, and then states, " * * * You never asked anything about the baby so I'm enclosing a snap shot." The letter concludes with remarks on the expensiveness of her maternity care, on which she was still paying, and the help her mother and sister had been in helping her take care of the baby.

The gist of plaintiff's complaint is that the defendant misled and practiced a fraud upon him by failing to tell him, before he executed the entry of appearance and answer, of the date upon which the child was born. Defendant's letter of March 30,

1953, is by no means conclusive on that issue. As a matter of fact, it cannot be deemed to be a certainty from that letter that plaintiff was then unaware that a child had been born—else why did defendant chide plaintiff in the letter for having failed to inquire about the baby. But, even if plaintiff's testimony that the letter of March 30, 1953, was his first knowledge of the birth of the child be accepted as true, it does not necessarily follow that it was the extent of his knowledge at the time he signed the entry of appearance and answer. Plaintiff did not testify that there were no further communications after March 30, 1953, nor did he testify that he was unaware of the date of birth of the child at the time he signed the entry of appearance and answer. Furthermore, other than stating that he received the copy of the petition for divorce from defendant's counsel while he was stationed in Virginia, plaintiff gave no other testimony about the petition for divorce. He did not say that he read the allegation as to the then age of the child; that he relied on it; nor that he would have refused to have signed the entry of appearance and answer, and would have appeared and contested the divorce action, if he had known at that time that the child was then more than six months old. In fact, plaintiff never did testify as to when he first learned that the defendant was pregnant, nor when he first ascertained the date of the child's birth.

Opposed to this, defendant's testimony was that she had informed plaintiff, in July, 1952, that she was pregnant; that he had visited her in November, 1952, when it was noticeable that she was carrying a child; and that she had informed plaintiff, prior to her letter of March 30, 1953, that the child had been born. As to the allegation regarding the age of the child in her petition for a divorce, she explained that the petition had been drafted some time before it was signed, and at a time when the child was four months old; that a delay had ensued; and that when she executed the petition she did not notice the reference to

the child's age. In that connection, it is of interest to note that during her cross-examination, counsel for plaintiff, reading from a transcript of her testimony at the divorce hearing, held October 7, 1953, developed that defendant had then testified that in two days the baby would be nine months old. This clearly established that at the divorce hearing defendant was truthful and accurate in her testimony regarding the then age of the child.

■ In an action of this nature the plaintiff not only has the burden of proof, Coleman v. Coleman, supra, but he must establish the fraud in the procurement of the judgment by evidence which is clear, strong, cogent and convincing. Reger v. Reger, 316 Mo. 1310, 293 S.W. 414; Lieber v. Lieber, 239 Mo. 1, 143 S.W. 458; Coleman v. Coleman, supra. It is our conclusion, from a thorough study of the entire record, that plaintiff did not sustain the burden of proof, and that his evidence was not so clear, strong, cogent and convincing that he is entitled to prevail.

As pleaded in plaintiff's petition, the allegation that defendant practiced fraud upon the court which heard the suit for a divorce, and upon plaintiff, in claiming that plaintiff was the father of the child, was " * * * intrinsic in the sense of having pertained to the merits of the cause upon which the judgment of the court was rendered * * *," Jones v. Jones, supra, rather than to an extrinsic or collateral matter. But even if the most charitable view be taken of plaintiff's petition, and it be construed as charging extrinsic fraud regarding the paternity of the child, the judgment must stand. Subject to defendant's objection on the grounds of privilege, the chancellor admitted certain evidence of Dr. Barker, the physician who had attended defendant and delivered the child, as to the entries made by him, when defendant first employed him, regarding defendant's last menstrual period. Tentatively admitted, also subject to the same objections, was that part of the hospital record containing Dr. Barker's final diagnosis that parturition had been full term. Lastly, admitted on the same basis, was that part of the hospital record headed "Newborn Record," signed by Dr. Barker, in which one of the nurses, apparently under his supervision, had, at the time the infant was born, recorded certain information about it. As stated, the trial court made only a general finding in favor of defendant, and a considerable portion of plaintiff's brief on appeal is devoted to the contention that in failing to announce its ruling on such evidence the court below erred.

■ Since this is an appeal in an equity case, in which plaintiff has brought up the entire record, it is unnecessary for us to pass directly upon the chancellor's rulings, or lack thereof. We consider only such evidence in the record as we deem admissible, exclude from our consideration evidence improperly admitted, and reach our own conclusions on the evidence offered without regard to the trial court's rulings. Middleton v. Reece, Mo., 236 S.W.2d 335; Bowman v. Kansas City, Mo., 233 S.W.2d 26.

■■ Under that rule we are required to pass upon the admissibility of the foregoing evidence, and we have reached the conclusion that Dr. Barker's testimony as to the entries on his office records, and his final diagnosis as contained in the hospital record, were inadmissible. Our statute on competency of witnesses, Section 491.060 RSMo 1949, V.A.M.S., prevents a physician or surgeon from testifying, over the objection of the patient, to any information acquired by him while attending the patient, if the information acquired was necessary to enable him to prescribe for or treat the patient. The mode of acquisition of such information is not confined to that of oral or written communications by the patient, but extends to that which the physician obtains through his observation, inspection, examination and treatment of the patient. Smoot v. Kansas City, 194 Mo. 513, 92 S.W. 363; Gartside v. Connecticut Mut. Life Ins. Co., 76 Mo. 446. Where the relationship of pa-

tient and doctor exists, it is assumed that the information imparted by the patient was necessary for the purpose of aiding the physician in treating the patient, in the absence of evidence to the contrary. State v. Kennedy, 177 Mo. 98, 75 S.W. 979; Owens v. Kansas City, C. C. & S. J. Ry. Co., Mo. App., 225 S.W 234 The evidence we deem inadmissible concerned information which was communicated to the doctor by the defendant for the purpose of prescribing for and treating her, and that which he obtained during the rendition of his services to her, and was therefore subject to the objection of privilege. Epstein v. Pennsylvania R. Co., 250 Mo. 1, 156 S.W. 699, 48 L.R.A., N.S., 394; Obermeyer v. F. H. Logeman Chair Mfg. Co., 120 Mo.App. 59, 96 S.W. 673, affirmed 229 Mo. 97, 129 S.W. 209; Smart v. Kansas City, 208 Mo. 162, 105 S.W. 709, 14 L.R.A.,N.S., 565; Glasgow v. Metropolitan St. Ry. Co, 191 Mo. 347, 89 S.W. 915.

■ The admissibility of the "Newborn Record" sheet in the hospital records presents a novel and more difficult question It appears from the evidence, though somewhat sketchily, that the sheet entitled "Newborn Record" was made by a nurse and signed by Dr. Barker after the delivery. On the form was recorded the following information:

> "Name—F———; Doctor—Barker; Time of birth—1/9/53, 12:16 p. m.; Sex—female; Weight—8-8; Treatment—Eyes, Agno 3, Cord tied, cut; Measurements—19½" L; General Condition, Anomalies, Injuries—General condition good, heart & lungs normal, no anomalies or injuries; Summary— An apparently normal baby."

Plaintiff contends in his brief that this record was not necessary for the doctor to treat or prescribe for his patient, the mother, and that it is therefore admissible. Neither party has cited any case in which the factual situation remotely resembled that prevailing here, and our own research has disclosed but one, Jones v. Jones, 208 Misc.

721, 144 N.Y.S.2d 820. There, however, because of the default of the mother, the court had appointed a guardian ad litem to protect the interests of the infant, and it was the guardian ad litem who objected to certain interrogatories intended to have been propounded to the mother's obstetrician, seeking similar information as to the child's physical condition and appearance at birth. In excluding them the New York court ruled that upon the child's birth the obstetrician had become the infant's, as well as the mother's physician; and that as a party to the action the child was entitled to raise the objection of privilege. The question presented is a close one, but since under the view we take of the case the record is not determinative, we will consider it for whatever weight it may have.

■ As plaintiff concedes in his brief, the law presumes children born in wedlock to be legitimate. Jackson v. Phalen, 237 Mo. 142, 140 S.W. 879; Nelson v. Jones, 245 Mo. 579, 151 S.W. 80. This presumption is the strongest known to the law. Bernheimer v. First Nat. Bank of Kansas City, 359 Mo. 1119, 225 S.W.2d 745; Ash v. Modern Sand & Gravel Co., 234 Mo.App. 1195, 122 S.W.2d 45. "* * * The early common-law rule in England was that if a wife had issue while her husband was within the four seas—that is, within the jurisdiction of the King of England—such issue was conclusively presumed to be legitimate, except upon proof of the husband's impotence; and even if he was beyond the four seas, he must have been away for so long a period before the birth of the child as to make it a natural impossibility that he could be the father. * * *" 7 Am.Jur., pg. 636, Sec. 14. For a discussion of the lengths to which the principle was carried, see that authority.

■ The severity of the rule was such that it was modified so that the presumption is no longer conclusive but may be rebutted. Russell v. Russell, 1924, A.C. (Engl.) 687; 13 B.R.C. 246—H.L. Such is the state of the law today in Missouri. Boudinier v. Boudinier, 240 Mo.App. 278, 203 S.W.2d

89; Ash v. Modern Sand & Gravel Co., supra; Needham v. Needham, Mo.App., 299 S.W. 832. But the burden of proof is on the party asserting the illegitimacy, Jackson v. Phalen, supra. And the burden is indeed an onerous one, for the quantum of evidence necessary to overcome the presumption must be not only clear and convincing, Stripe by Shannon v. Meffert, 287 Mo. 366, 229 S.W. 762, but it must be such that no conclusion other than that of illegitimacy can be reached. Nelson v. Jones, supra; Ash v. Modern Sand & Gravel Co., supra.

■ Judged by these standards, plaintiff's evidence falls short of rebutting the presumption of legitimacy. There was no evidence of any extra-marital relations on the part of defendant. Both parties are in agreement that they engaged in sexual intercourse in the latter part of May, 1952. The infant was born January 9, 1953, or 229 days after the date of May 25, 1952, which plaintiff testified was the day defendant arrived in Springfield, Massachusetts. It has been said that a court may take judicial notice that the normal period of human gestation is 280 days, and, in fact, Dr. Barker so testified. State v. Drummins, 274 Mo. 632, 204 S.W. 271; Caspermeyer v. Florsheim Shoe Store Co., Mo.App., 313 S.W.2d 198; Boudinier v. Boudinier, supra. However, there was no medical evidence produced that a claimed period of gestation of 229 days is a medical impossibility, and while that period of time is obviously shorter than the usual period, it is not so extraordinarily divergent therefrom that we can judicially say that it is medically impossible. 31 C.J.S. Evidence § 79; Harward v. Harward, 173 Md. 339, 196 A. 318.

■ Plaintiff directs our attention to the "Newborn Record" sheet in the hospital records, which contains the foregoing information of the physical characteristics and condition of the infant at birth, and argues that had the child been a seven months baby it would have required incubation, as to which the hospital record was silent. The fallacy in that argument is in assuming that we can take judicial notice of the range of weight, length and general condition of a seven months infant as compared with those of a nine months child, and in further assuming that we can find, as a matter of judicial notice, that every seven months baby requires incubation. These are not matters of which we may take judicial notice, and expert medical testimony should have been introduced regarding them. Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S.W.2d 323; State ex rel. Inter-State Oil Co. v. Bland, 354 Mo. 622, 190 S.W.2d 227; Heibel v. Robison, Mo.App., 316 S.W.2d 238.

Plaintiff cites Needham v. Needham, supra, and Boudinier v. Boudinier, supra, in support of his argument that he rebutted the presumption of legitimacy. In the Needham case both parties conceded that the infant was a nine months baby (though born only seven months after the marriage of the parties), and there was convincing evidence, in the form of a letter written by the wife, that she had engaged in sexual intercourse with another man before the marriage and that he was the father of the child. In the Boudinier case there was also a strong inference from the evidence that the wife had had extra-marital relations with at least one other man, and perhaps two, and the claimed period of gestation was 316 days, which that court held was so extraordinary and "extravagantly improbable" that it should not be accepted as the truth. It is readily apparent that the facts in those cases, which were held sufficient to rebut the presumption of legitimacy, were far stronger than those in the instant case.

The Commissioner therefore recommends that the judgment be affirmed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

The judgment is, accordingly, affirmed.

WOLFE, P. J., RUDDY, J., and SAM C. BLAIR, Special Judge, concur.