Marcella CASPERMEYER (Plaintiff), Respondent,

v.

FLORSHEIM SHOE STORE CO., of St. Louis, a Corporation, Defendant,

Be-Mac Transport Co., Inc., a Corporation (Defendant), Appellant.

No. 29755.

St. Louis Court of Appeals.

Missouri.

May 6, 1958.

Francis R. Stout, Richard M. Stout, St. Louis, for appellant.

Carl A. Enger, St. Louis, for respondent.

RUDDY, Presiding Judge.

This action was brought by respondent (plaintiff) against appellant, Be-Mac Transport Co., Inc., (defendant) and the Florsheim Shoe Store Company of St. Louis, Missouri, to recover for injuries sustained when respondent fell into an open sidewalk loading chute used by the shoe store for receiving merchandise. A motion for a directed verdict presented by the Florsheim Shoe Store Company at the conclusion of plaintiff's evidence was sustained by the trial court. From a judgment in favor of respondent, the Be-Mac Transport Co., Inc., appeals. We shall refer to the parties as plaintiff and defendant.

The principal point relied on by defendant is that the trial court should have directed a verdict in its favor (a) because the only testimony connecting defendant with the casualty was at war with, and contrary to, plaintiff's own testimony; and (b) because the plaintiff's own evidence showed she was contributorily negligent as a matter of law in not seeing defendant's employee ahead of her on the sidewalk. This point and its supporting reasons require a rather full review of the testimony of plaintiff and defendant's truck driver.

The Florsheim Shoe Store Company of St. Louis operates a retail shoe store at the northwest corner of Seventh and Olive Streets in the City of St. Louis. Between the curb line of Seventh Street and the eastern side of the shoe store is a loading chute, variously described in the testimony as a metal sidewalk loading door, a hatchway and as a loading chute. It is approximately 6 feet east of the eastern edge of the shoe store and about 2 feet west of the curb line of Seventh

Street. The loading chute is in an areaway underneath the sidewalk that leads to the basement under the shoe store. The chute runs directly under the sidewalk into the basement of the shoe store and slopes down from the sidewalk to the basement opening and forms a chute or slide to convey merchandise from the sidewalk level to the basement. When the loading chute is not in use the area containing the chute is covered by two metal doors that operate on hinges. These metal doors when closed are flush with the surface of the concrete sidewalk and form a part of the walk used by pedestrians. These doors open upward from the surface of the sidewalk. One of the doors opens toward the north and the other toward the south. Both doors when open are held upright by means of chains that are attached to the doors and the iron frame containing the doors. This frame is imbedded in the concrete sidewalk. The approximate over-all dimension of the doors according to the testimony was 38 inches by 44 inches. These doors when not in use are locked by means of a slide bolt on the bottom of one of the doors. In order to lock the doors this bolt is pushed through metal attachments on both doors with openings to receive the slide bolt. When this bolt is pushed through these openings the doors cannot be opened from the sidewalk. When the bolt is released the door that opens toward the north may be opened from the sidewalk level by means of a handle in this door. When the north door is lifted it permits the south door to be opened from the sidewalk level.

On April 29, 1954, around noon, a truck owned by defendant, Be-Mac Transport Company, Inc., and operated by its driver, Andrew J. McDermott, stopped on Seventh Street parallel to the west curb for the purpose of delivering merchandise to the shoe store. The truck stopped at or close to the chute and about two or three inches east of the curb. Shortly after the truck stopped, plaintiff when walking on the Seventh Street sidewalk fell into the areaway and was injured when the north door of the loading chute was raised.

Prior to the incident that caused her injury, plaintiff testified she had purchased a pair of orthopedic shoes in the Chemical Building at Eighth and Olive Streets. She had her 3½ year old son, John, with her and when she left the Chemical Building it was with the intention of going to the Forum Cafeteria which is on the west side of Seventh Street between Olive and Locust Streets. This cafeteria is north of Olive Street and immediately north of the shoe store. She proceeded east on the north side of Olive Street. Her little son was on her left and she was holding him by the hand. When she turned off of Olive Street and proceeded north on Seventh Street her son was between her and the building occupied by the shoe store. At the place where she purchased the orthopedic shoes her young son was given a small plastic shoe horn by the salesman which the child had in his hand as he walked with his mother. At the time of the occurrence that caused her injuries plaintiff had been pregnant for seven months and she testified she expected the baby June 25, 1954.

As plaintiff walked north on Seventh Street she was holding the left hand of her young son. When the boy either dropped the shoe horn or just pulled his hand away from his mother, she was not sure which occurred, she stopped. She testified that she then "stood still momentarily." In this connection she also testified that she "stood there a second looking forward, because I didn't want to walk into anybody or get bumped in the stomach, I was pretty big at that time * * *." She further testified, "the next step I took, I just fell into this opening." At the time she "stood still momentarily" she was standing on the south door covering the loading chute areaway. Her young son at this time was west of the loading chute. When asked if she ob-

served a truck parked parallel to the west curb, she answered, "I think I did, but that I wouldn't be too sure." She did notice the truck after she was pulled out of the chute opening.

On direct examination when she was asked if she saw "anyone near or close to or about this cellar loading door," she answered, "There was no one there." However, on cross-examination she said there was no one "right close" to her.

Plaintiff saw no one open the north door and she does not know how it was opened. Her testimony shows that the north door was not open when she stopped on the south door. She testified no one gave her a warning or any indication that the door was open or about to be opened. No one was guarding the opening and she saw no barricades of any kind.

When she stepped into the areaway she fell in up to her shoulders and neck. She testified that at least two men helped her out of the opening. One of the men, R. J. Landgraf, wrote his name on a piece of paper and gave it to her.

She testified she knew the door was in the sidewalk, but "did not look down on it" before she took the step after stopping. She said she looked straight ahead and did not look down at her feet because she "might have walked into somebody." She added, "I couldn't see my feet even." In this regard she had in mind her condition due to the pregnancy. Prior to the fall she heard nothing.

She testified "There was a man inside" (obviously meaning either in the areaway or the basement of the shoe store) who later came up to the sidewalk. She could not say that he had opened the door. After the occurrence she did see the driver of the truck at the scene and on cross-examination when she was asked, "As a matter of fact, wasn't he the man that was opening the door, the door from on the sidewalk?" she answered, "No one was opening it that I saw."

She further testified she did not know if it was possible for someone to have raised the door without bumping into her. She could not truthfully say that she would have seen a man walking up to and opening the north door covering the areaway. She said there was nothing between her and the north door to obstruct her view if someone was on the north door.

Richard J. Landgraf, a witness called by plaintiff, testified he was walking south on the west side of Seventh Street between Locust and Olive Streets and when he was "almost shoulder to shoulder" with plaintiff and "just as we were about to pass, this lid in the sidewalk, opened up," and plaintiff "went straight down." On cross-examination, when he was asked if he saw the door open, he answered, "I can't say that I saw it because I was looking straight ahead, * * * but I heard it open and I saw her go down * * *." He further testified she was on the other door when the north door was opened. However, he testified that she had not stopped on this door, but "kept right on walking." He was to the right of the door and to the left of plaintiff when she fell.

He saw no warning sign and heard no warning given when the door was raised. He saw no barricades around the opening. He thought there was no one within 10 feet of the opening at the time plaintiff fell. He did not see how the door was closed. He saw a truck parked parallel to the west curb of Seventh Street. We have omitted other testimony of this witness not pertinent to the point being considered.

Richard Lawrence, employed by the Florsheim Shoe Store, was called as a witness by plaintiff. He testified that the truck driven by McDermott stopped beside the loading chute on Seventh Street. When he saw the truck there he went down into the basement to unlock the sidewalk doors to the chute areaway. When the witness arrived in the basement·

he stepped on the chute and unlocked the areaway sidewalk doors by means of the slide bolt. After he unlocked the doors he stepped off the chute and started to get a "safety bar" which he said was to be placed on the sidewalk between the two doors as a guard to keep pedestrians away from the areaway opening. This safety bar was in the basement and he was going to hand it to McDermott after the doors were open. Before he picked up the safety bar he testified, "I happened to look up and I saw this lady's leg there, and that is as far as I got." He said he did not open the doors to the chute opening. When he unlocked the doors, he called "Okay, Mac," meaning the doors were unlocked and could be opened from the sidewalk.

He further testified the doors could not be opened until the slide bolt was moved from the inside. He did not see McDermott open the doors. After he saw the lady's leg in the chute opening he walked up a ladder on the side of the wall which he described as a "two by four wooden ladder." When the witness reached the sidewalk he saw plaintiff sitting on the sidewalk and with her were McDermott, the truck driver, and a police officer. He climbed out of the chute areaway onto the sidewalk, closed the doors to the chute areaway and then went into the shoe store.

Andrew J. McDermott, called as a witness by plaintiff, testified he was employed as a chauffeur by defendant Be-Mac Transport Company, Inc. Around noon-time on the day of the injury to plaintiff McDermott parked his truck about two to three inches east of the west curb of Seventh Street in the vicinity of the chute. He then went to the door of the shoe store and told Richard Lawrence he had some shoes to deliver. He went back to the truck and opened the doors of the truck. Thereafter he went over to the doors covering the chute opening and stood on the south door waiting for the signal from Richard Lawrence. He heard the bolt in

the door slide and when he received the signal from Richard Lawrence he started to lift the north door when a little child "bumped" him on his left leg. He pushed the child out of the way and then turned from the child to raise the north door. While in the act of raising the door plaintiff bumped him and "knocked" him a few feet. The next thing he saw was plaintiff's leg in the chute areaway.

He further testified that he had his fingers on the latch used to open the door and when he was bumped he said, "naturally the door went up straight where it belongs * * *." The exhibits introduced in evidence show the latch used to open the north door was on the extreme east end of the door.

He further testified that while he was opening the door with his one hand he was "waving" the other hand to keep the people away from the opening because there was much pedestrian traffic at the time. While he was waiting for the signal from Richard Lawrence and when opening the door he was facing north, which would put plaintiff to his rear as she was walking north. He did not see plaintiff until she bumped into him.

He further testified there was no barricade of any kind on the sidewalk to guard the opening and that he did not go into the basement or areaway to loosen the latch. He said that the union contract under which he works forbids such service. After plaintiff fell into the opening, the witness "grabbed her underneath the arms and sat her on the sidewalk." He said no one assisted him in lifting plaintiff out of the opening. After he assisted her to the sidewalk a police officer arrived on the scene and took care of plaintiff thereafter.

Defendant's principal contention is that plaintiff's own testimony is directly contrary to and at war with the testimony of plaintiff's only witness to the opening of the door. Defendant states that Mc-

Dermott testified he was straddling the two doors when the signal was given from within that they were unlocked, and he was standing on the south door when he opened the north door. Defendant also points to the testimony of plaintiff that she saw no one "right close" to her when the door opened. This testimony of plaintiff is not at war with or contrary to the testimony of McDermott. The evidence shows that immediately before plaintiff took the step into the opening, she was occupied with the affairs of her small son. It will be recalled that the son either dropped the shoe horn he had or pulled away from his mother and that he was to her left prior to the time he pulled away from her. If plaintiff's attention was attracted in the direction of the son's activities, who was either to her immediate left or in front of her and to the left, she would not necessarily be conscious of the presence of McDermott who must have been stooping over in the act of raising the door at that time. Her unawareness of McDermott's presence is more understandable when we consider plaintiff's physical condition due to her pregnancy. It will be remembered that the latch used to open the door was on the extreme east end of the north door and that this door was 44 inches in length. In order for McDermott to open the north door while standing on the south door, as he testified, he would have to be either on or close to the east half of the south door. This position of McDermott is confirmed by his testimony when he testified that the son of plaintiff bumped him on the left ankle. When the son of plaintiff pulled away from her, either to recover the shoe horn or for any other reason, the attention of plaintiff was obviously directed to the boy and away from others around her. While she did say she did not see anyone "right close" to her, she also testified she was concerned about walking into people and for this reason, while she was standing still, she was looking forward. This testimony of plaintiff does not

necessarily mean that she was looking directly north. This seems to be the inference taken by defendant from this portion of plaintiff's testimony. The jury could have found that plaintiff was looking northwest in the direction of her son's activities. The testimony does indicate that plaintiff realized others were close to her and for this reason she had to be careful about walking into them. In this same connection it will be remembered that plaintiff was not sure the truck was parked parallel to the west curb. This does not mean the truck was not there. Plaintiff was not conscious of its presence.

Defendant contends plaintiff conceded there was nothing to obstruct her view of a man on the sidewalk. We have a different impression of her testimony. When she was asked the following question, "Was the view such that you would have seen a normal sized man walking up to the north door and pick it up, if he had done so?" an objection was raised to the form of the question. The court in ruling on the objection said: "She may answer, if she can." Thereafter, the plaintiff gave the following answer: "I don't think I can, truthfully. Q. Don't think you can answer the question? A. Not truthfully."

It is true she said she saw no one between her and the north door but we think the purport of her testimony is to the effect that she could not truthfully say she would have seen a normal sized man walking up to the north door. She clearly left the way open to infer that someone could have walked up to the north door and she would not have seen him and for this reason she did not want to answer the question as it was propounded. We are of the opinion that no such admission was made by plaintiff as is contended by the defendant.

Defendant further contends that plaintiff cannot be heard to say that she does not know the cause of the door being opened and yet reject all of the testimony

of McDermott as to how it was opened. We find no conflict in connection with this portion of the testimony of the two witnesses. It is obvious from a reading of the record that the north door was raised almost simultaneously with the forward step of plaintiff that precipitated her into the opening. Plaintiff having had her attention drawn to the activities of her small son would not be in a position to know just how the door was opened at the time she took this forward step into the opening. It is. true that McDermott testified he had been waving people away from the doors, warning them they were about to be opened, but the jury could have found that he abandoned his waving effort or this effort could not be seen by plaintiff when he stooped over to reach for the latch in order to open the north door. It was at this instant plaintiff came upon the scene. We interpret plaintiff's testimony to hold that she saw no one opening the door. At no time did she testify that McDermott did not or could not have opened the door. As a matter of fact she testified she saw McDermott at the scene after she fell.

Nor do we find McDermott's testimony at war with plaintiff's theory of recovery. Plaintiff alleged defendant suddenly opened the door and plaintiff's instruction No. 5 required the jury to find that the defendant through its employee suddenly opened the sidewalk loading door. This theory is in harmony with McDermott's testimony.

Defendant has directed our attention to a number of cases which hold that plaintiff is not entitled to the benefit of the defendant's evidence when such evidence contradicts the plaintiff's own testimony and is contrary to plaintiff's own theory of the case. We find it unnecessary to discuss these cases or the applicability of the rule announced to the instant case, because we find no contradiction between plaintiff's own testimony and the testimony of the driver of defendant's truck. Also,

the futility of discussing these cases is evident when it is realized that the applicability of the rule depends on the various fact situations. None of the fact situations in the cases cited parallels the facts in the instant case.

■ Another point relied on by defendant asserts plaintiff was contributorily negligent as a matter of law in not seeing defendant's employee ahead of her on the sidewalk. What we have said in connection with our discussion of the first point demonstrates the invalidity of this point. Plaintiff's attention was attracted to her son's activities immediately prior to stepping into the opening and we do not think her failure to see the opening under the circumstances present, when she was injured, convicts her of contributory negligence as a matter of law. Her negligence, if any, in this respect was properly submitted to the jury for determination.

Defendant relies on the case of Sloan v. American Press, 327 Mo. 470, 37 S.W.2d 884. In that case plaintiff fell into an open elevator shaft located in an areaway in a sidewalk. When the elevator was not in use the opening in the sidewalk was covered by a pair of iron doors which operated the same as those in the instant case. The evidence in the Sloan case showed that plaintiff walked for some distance with his eyes, face and body turned toward a man on the other side of the street. While doing this, he failed to see the plainly visible open elevator shaft and the barriers surrounding it. The court in holding plaintiff was contributorily negligent as a matter of law said that he could have seen the obstruction a long way ahead and that he could have glanced forward from time to time observing his course but that he failed to do so. We have no such facts in the case before us.

In the instant case one of the sidewalk doors was opened suddenly when plaintiff was on the other door. The opening was not plainly observable for a substantial

distance. Even the testimony of McDermott shows the door was not completely raised when he was bumped by plaintiff.

In the case of Stith v. J. J. Newberry Co., 336 Mo. 467, 79 S.W.2d 447, cited by defendant, the court held plaintiff was not contributorily negligent as a matter of law and that her negligence, if any, was for the jury's determination.

We said in the case of Butler v. City of University City, Mo.App., 167 S.W.2d 442, loc.cit. 446: "Ordinarily a person who uses a sidewalk in a city street is not required to pay exclusive attention to the sidewalk immediately in front of him, but may act on the assumption that the sidewalk, is in a reasonably safe condition, and may without fault allow his attention to be diverted, momentarily at least, by circumstances which concern his own interest. 2 Restatement, Law of Torts, Section 289-K."

In the case at bar plaintiff's attention was diverted momentarily. Her negligence, if any, in the respect complained of by the defendant was properly submitted to the jury for determination. The trial court did not err in overruling defendant's motion for a directed verdict.

Defendant relies on a number of other points. In the first one for discussion it asserts that the trial court erred in admitting evidence of mental anguish which plaintiff alleges she suffered. In this same connection it is contended the trial court erred in instructing on mental anguish as an element of damages and permitting argument thereon to the jury by plaintiff's attorney. As heretofore stated, plaintiff's evidence showed that the plaintiff was pregnant at the time of her injury; that the birth of the child was expected June 25, 1954, and that it was not born until July 19, 1954.

The evidence further showed that prior to the fall of plaintiff she could feel movements of the fetus in the lower portion of her abdomen but after the fall she could feel no movements. This caused concern and apprehension on the part of plaintiff, thinking either injury or death had befallen the expected child. After plaintiff fell she was taken to the hospital where doctors in attendance listened for heartbeats of the unborn baby. Dr. Mezera, who examined plaintiff, testified he could not detect any hearbeats. Plaintiff's left side and stomach were bruised and cut and plaintiff was highly nervous after the accident. She did not sleep well and testified she walked the floors at night, because of worry about the baby's welfare.

The final diagnosis of Dr. Mezera was that plaintiff suffered multiple abrasions and bruises of the chest and abdomen, multiple bruises and scratches of both lower extremities and a traumatic fibrositis which is an inflammation of the fibrous tissue that holds the ribs to the breast bone and that this traumatic fibrositis caused difficulty in breathing.

On cross-examination Dr. Mezera characterized the cuts and bruises as severe. The injuries stated indicate that plaintiff received a rather severe blow to both lower extremities and to her abdomen. The pain in the chest and the difficulty in breathing continued until the birth of the child. As a result of her injuries, the circumstances of the fall, the pain in the chest, and the failure to feel movement of the fetus, plaintiff worried and was concerned about the welfare of her expected baby. Defendant contends, in connection with the point under discussion, that plaintiff's physical injuries were so trifling and inconsequential, damages should not have been allowed or awarded for mental anguish not shown to be directly connected with the injuries. It is our opinion that the injuries and the circumstances under which they were received formed a sufficient basis for submission to the jury of mental anguish as an element of damages. In Trigg v. St. Louis, K. C. & N. Ry. Co., 74 Mo. 147.

153, 41 Am.Rep. 305, the Supreme Court of this state said: "The general rule is that 'pain of mind, when connected with bodily injury, is the subject of damages; but it must be so connected in order to be included in the estimate.' "

■ This same rule has been restated and applied in Brisboise v. Kansas City Public Service Co., Mo., 303 S.W.2d 619; Bedenk v. St. Louis Public Service Co., Mo., 285 S.W.2d 609, and Chawkley v. Wabash Ry. Co., 317 Mo. 782, 297 S.W. 20. Mental anguish may be caused by pain of body or mind, or both, even where the injury may not be external or visible. Physical pain and mental anguish, usually and to some extent necessarily flow from or attend bodily injuries. It is not necessary to make specific proof of pain and mental anguish. These elements of damage are sufficiently shown by the evidence which discloses the nature, character and extent of the injuries. From such evidence the jury may infer pain and mental anguish. Kennedy v. St. Louis Transit Co., 103 Mo.App. 1, 78 S.W. 77. We think mental anguish may properly be based on the worry, apprehension and concern of plaintiff for the welfare of her future offspring.

In the case of Fehely v. Senders, 170 Or. 457, 135 P.2d 283, loc.cit. 290, 145 A. L.R. 1092, in which the precise question for decision was whether the apprehension (which proved to be groundless) of a pregnant woman that her child may be born dead or deformed as a result of an injury to her person was an element of damage. The court in an exhaustive opinion wherein it examined the authorities of other jurisdictions said:

"We think that apprehension of that sort is the natural consequence of a blow on the abdomen such as the plaintiff suffered, or at least that a jury could so find, and that it could be mental distress the most acute. The extent of the plaintiff's suffering and the compensation to be awarded

must be left to the sound judgment of the jury."

The court also said:

"The defendant argues that, in all events, the evidence should not have been submitted to the jury because there was no medical testimony to show that the apprehended result would probably follow from the injury. It seems to us that this contention misses the point. The question is not whether, in the expert view, injury to the unborn child will probably follow, but turns upon the expectant mother's natural mental reaction to the injury."

In the Fehely case the court held that plaintiff was entitled to recover for the mental anguish suffered despite the fact that her fears proved to be unfounded and that she gave birth to a normal child. It seems too clear for controversy that worry, apprehension and anxiety on the part of the mother under the circumstances is a natural consequence of the experience and injuries such as were suffered by plaintiff when she fell into the chute opening. Such apprehension and anxiety can be appreciated and understood by this court.

■ In the case of Freeman v. Lavenue, 99 Mo.App. 173, 72 S.W. 1085, this court held plaintiff should have been permitted to show as an element of damage, that he was in reasonable apprehension of blood poisoning as the possible if not probable consequence of his injury. We think the trial court in the instant case properly admitted evidence of mental anguish and properly included it as an element of damage in the instructions to the jury. Also, the trial court did not err in permitting argument thereon by the attorney for plaintiff.

■■ Other points in connection with the issue of mental anguish are relied on by defendant. The first of these is that

the trial court erred in permitting plaintiff to testify that her baby "was expected June 25th." Defendant contends this was an unsupported conclusion and was based on hearsay. In support of the contention that her answer was based on hearsay, defendant points to the testimony of plaintiff wherein she gave the following answer, when asked when the baby was expected, "Well, my doctor that was going to deliver the baby said it was due * * *." At this point an objection to this answer was made by defendant's counsel and was sustained by the court. Thereafter, plaintiff was asked if she knew when the baby was expected and she answered, "June 25, 1954." Her answer was not based on the doctor's statement to her. Defendant also complains there was no testimony of any facts upon which plaintiff's testimony in the above respect could have been based. What facts does defendant seek to elicit? This complaint could be the basis for launching missiles of witticisms in the direction of defendant. It is our duty to exercise restraint. Witticisms have no place in a discussion that involves motherhood. We see no need, nor do we have the desire, to explain to defendant why plaintiff, and perhaps no one else, has personal knowledge of the date of the expected event. It is sufficient to point out that the period of human gestation is a matter of common knowledge and that the courts take judicial notice that the period of human gestation is about 10 lunar months or 280 days. State v. Drummins, 274 Mo. 632, 204 S.W. 271. The beginning of the period of gestation can only be known to plaintiff. Thereafter, the date of birth is a matter of arithmetic. We think plaintiff's testimony, wherein she gave the expected date of birth of the baby, was based on her knowledge and was properly admitted in connection with the issue of mental anguish pleaded by plaintiff.

■ Defendant contends the court erred in permitting plaintiff to testify she felt no fetal movements after the fall and injuries. This testimony was properly admitted in connection with the issue of mental anguish.

■ Defendant contends that the trial court erred in permitting plaintiff's husband to testify that plaintiff was worried about her unborn baby and exhibited mental anguish about the baby. This witness related the injuries he observed on the body of his wife and testified to complaints made by the wife about the pain in her chest. The witness also testified to the emotions and worry manifested by his wife which he observed. There was very little testimony in this regard given by this witness. We have examined the testimony in the light of the complaint made by defendant and find that the complaints testified to related to plaintiff's then existing condition and were the natural and spontaneous expressions of her feelings at the time. Kenney v. J. A. Folger & Co., Mo.App., 192 S.W.2d 73. When an objection was made by defendant to this testimony, the trial court said he would permit the witness to testify as to his observations of the wife "at that time," meaning at the time the observations and complaints were made. We find no error in the admission of this testimony.

The next point relied on by defendant concerns an answer given by plaintiff's witness, Dr. Mezera, to a hypothetical question, wherein the injuries and the circumstances of the accident were related. His answer was "I think that it could have caused mental anguish." Defendant contends the answer falls short of having probative value and expresses no opinion or judgment. We need not concern ourselves further about this point because later in his testimony the doctor said the facts and circumstances recited in the hypothetical question would cause mental anguish and apprehension.

■ Defendant also contends that mental anguish is not a proper subject for expert medical testimony. We find no need

to answer this contention because there was ample testimony from plaintiff and her husband to support a finding of mental anguish. If there was error, which we do not hold, it was harmless, in view of the sufficiency of the other evidence. Error that is not prejudicial to the complaining party will not effect a reversal of the judgment or be grounds for a new trial.

On two occasions in the course of the testimony of Richard J. Landgraf he said he told someone at the scene of the accident that he thought "it was the most careless thing" he ever saw. Defendant's objection to these statements was sustained by the court, but the court overruled defendant's request for a mistrial. Defendant now complains of this ruling. The trial court instructed the jury to disregard these statements. Whether or not a mistrial should have been declared is a matter of discretion. We find no abuse of discretion by the trial judge. This point is ruled against defendant.

Defendant next contends that the trial court erred in reading to the jury plaintiff's only verdict directing instruction after reading defendant's instuction on contributory negligence. Defendant contends this was an illogical procedure and gave undue prominence to plaintiff's instruction and disparaged its defense of contributory negligence. We agree that this procedure did not follow the usual and established order that prevails in the trial of cases. However, we see no prejudice that could befall defendant in this arrangement. Jurors have the duty to apply the law as given them in the instructions to the facts of the case, regardless of the order in which the instructions are read to the jury. The order in which the instructions were read to the jury in the instant case was a matter of discretion with the trial judge.

Defendant also contends that plaintiff's verdict directing instruction was erroneous in several respects. To recite the several complaints made about this instruction by defendant would unduly lengthen this opinion. It is sufficient to say that we have reviewed the complaints and the authorities cited by defendant and we find that the instruction, after hypothesizing the facts, does require the jury to find the defendant negligent before returning a verdict for plaintiff. Also, we think the instruction sufficiently hypothesizes the facts necessary to a finding of negligence by the jury. We also find that the instruction is not misleading in its language dealing with the contributory negligence of plaintiff. The complaint that the instruction permits a recovery on the theory that it is at war with and contrary to plaintiff's theory of the case has been sufficiently discussed elsewhere in this opinion. A careful examination of this instruction convinces us that it did not mislead the jury and that it required the jury to find that the hypothesized facts constituted negligence and that it was proper and sufficient in other respects. However, we feel constrained to say that we do not recommend plaintiff's instruction in this case as a model to be used in similar cases.

Defendant also complains of the trial court's rulings in connection with portions of the argument of plaintiff's attorney to the jury. In one of the instances complained of the trial court sustained defendant's objection to the argument made but refused to sustain defendant's request for a mistrial. We have carefully examined the points raised by defendant in connection with the argument of plaintiff's attorney to the jury and we are satisfied that the trial court did not abuse its discretion in the manner in which it ruled. It is conceded by appellant that the trial court does have an area of discretion in ruling on objections to argument of counsel to the jury.

The final point asserted by defendant is that the verdict for $3000 is

grossly excessive. We have stated the extent and nature of the injuries sustained by plaintiff when discussing the issue of mental anguish which was submitted to the jury as an element of damages. The only additional evidence necessary to be stated at this point is plaintiff's testimony that for the first several weeks after the accident she was confined to her bed and she noticed no marked improvement in her condition until after the baby was born on July 19, 1954.

While we feel that the verdict was ample, we do not feel justified in interfering with the verdict in view of the injuries received and the mental anguish suffered.

Finding no error in the trial of the case, the judgment of the trial court should be affirmed. It is so ordered.

ANDERSON, J., concurs.